**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 15-1312 (Consolidated with No. 15-1359)**

IN THE
**United States Court Of Appeals**
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

MIDWEST DIVISION - MMC, LLC, DOING BUSINESS AS MENORAH MEDICAL
CENTER.,
*Petitioner*

*v.*

NATIONAL LABOR RELATIONS BOARD.,
*Respondent*

NATIONAL NURSES ORGANIZING
COMMITTEE-KANSAS/NATIONAL NURSES UNITED,
*Intervenor*

_____

PETITION FOR REVIEW OF AN ORDER OF THE NATIONAL LABOR
RELATIONS BOARD

**BRIEF OF PETITIONER**

Noel J. Francisco
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939
njfrancisco@jonesday.com

F. Curt Kirschner, Jr.
Jonathan Sack
JONES DAY
555 California St., 26th Floor
San Francisco, CA 94104
(415) 626-3939
ckirschner@jonesday.com
jsack@jonesday.com

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### I.    PARTIES AND AMICI

The parties before the National Labor Relations Board ("NLRB" or the "Board") were: (i) the Office of the General Counsel of the NLRB; (ii) National Nurses Organizing Committee – Kansas/National Nurses United (affiliated with National Nurses Organizing Committee/National Nurses United) as the Charging Party, and (iii) Midwest Division – MMC, LLC d/b/a Menorah Medical Center ("Menorah" or the "Hospital") as the Charged Party.  In the proceedings before the NLRB, the American Hospital Association, the Kansas Hospital Association, the Texas Hospital Association, and the Texas Nurses Association filed an *amicus curiae* brief in support of Menorah Medical Center.

The parties before this Court are (i) Petitioner Menorah Medical Center; (ii) Respondent National Labor Relations Board; and (iii) Intervenor National Nurses Organizing Committee – Kansas/National Nurses United.

### II.    RULINGS UNDER REVIEW

Menorah Medical Center petitions for review of the August 27, 2015, Decision and Order of the NLRB in NLRB Case Nos. 17-CA-088213 and 17-CA-091192 (the "Decision").  This Decision is reported at 362 NLRB No. 193.

### III.    RELATED CASES

On, September 4, 2015, the Hospital petitioned this Court (No. 15-1312) to

-i-

review the Decision.  Counsel for the General Counsel of the NLRB filed on

October 21, 2015, a cross-application for enforcement (No. 15-1359), which

matters were then consolidated before this Court on October 23, 2015.

The Decision under review has not previously come before this or any other court.

There are no other related cases.

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for Petitioner Menorah Medical Center states that

Midwest Division – MMC, LLC, which owns and operates Menorah Medical

Center, is a wholly-owned, indirect subsidiary of HCA Holdings, Inc., a publicly-

traded Delaware corporation.  Hercules Holding II, LLC currently owns at least

10% of HCA Holdings, Inc.'s common stock.

Midwest Division – MMC, LLC's general nature and purpose, insofar as

relevant to this litigation, is to provide quality patient care as a full-service, acute

care hospital located in Overland Park, Kansas.

## **TABLE OF CONTENTS**

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ........... i

  I.   PARTIES AND AMICI .................................................................... i

  II.  RULINGS UNDER REVIEW ......................................................... i

  III. RELATED CASES ........................................................................ i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................ vii

GLOSSARY ......................................................................................... xii

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF ISSUES ................................................................... 1

STATUTES AND REGULATIONS ...................................................... 2

INTRODUCTION ................................................................................. 2

STATEMENT OF THE FACTS ............................................................ 6

  I.   THE NURSING BOARD AND THE PEER REVIEW  COMMITTEE ........ 6

    A. The State of Kansas Maintains a Robust Regulatory  Scheme for
       Nurse Licensure ...................................................................... 6

    B. The State Board of Nursing Investigates Incidents Reported  by Peer
       Review Committees at Medical Care Facilities ............................ 9

    C. The Committee's Proceedings and Information Submitted  to or
       Generated By the Committee Are Confidential and  Privileged. .............. 10

    D. The Hospital Has a Risk Management Plan Approved by  the State
       of Kansas That Explains the Peer Review Purpose  and Process ............... 12

  II.  PEER REVIEW COMMITTEES DO NOT ISSUE DISCIPLINE .............. 14

III.  THE COMMITTEE REVIEWED REPORTED INCIDENTS INVOLVING NURSES SHERRY CENTYE AND BRENDA SMITH. ...................................................................................15

  A.  Incident Involving Sherry Centye ............................................15

  B.  Incidents Involving Brenda Smith..............................................18

    (1)  April 2012 Incidents Involving Brenda Smith.....................18

    (2)  July 2012 Incidents Involving Smith .................................20

IV.  THE UNION REQUESTED CONFIDENTIAL INFORMATION THAT IS SUBJECT TO THE PEER REVIEW PRIVILEGE. .....................21

SUMMARY OF ARGUMENT ..............................................................23

STANDING .........................................................................................26

STANDARD OF REVIEW ....................................................................26

ARGUMENT .......................................................................................28

  I.   THE BOARD ERRED BY ASSERTING JURISDICTION OVER THIS DISPUTE. ...............................................................................28

  A.  The Peer Review Committee Is Created Directly By The State of Kansas And Acts As An Administrative Arm of the Government............28

    (1)  The Peer Review Committee Was Established by the State of Kansas.......................................................................................30

    (2)  The Peer Review Committee Was Established For The Sole Purpose of Assisting the State Board of Nursing in Regulating the Nursing Profession. ...........................................................30

    (3)  The State of Kansas Has Significant Control over the Committee's Governing Structure..........................................31

    (4)  The State of Kansas Exercises Substantial Control Over the Nursing Board's Priorities and Operations. ..........................32

  B.  The Peer Review Committee Is Administered By Individuals Who are Responsible to Public Officials.............................................33

C.  The Board Neglected to Consider the Hospital's Argument  that the NLRB Lacks Jurisdiction Under Section 2(2) of the  Act. ........................34

II.   THE BOARD ERRED BY HOLDING THAT *WEINGARTEN* RIGHTS APPLY IN CONFIDENTIAL PEER REVIEW MEETINGS. ...................................................................37

A.  The Board's Extension of *Weingarten* Rights to Licensure Proceedings Is Inconsistent with the NLRA. ...............................37

B.  *Weingarten* Rights Do Not Apply To Peer Review  Interviews Where Employees Participate Voluntarily And  That Could Not Reasonably Lead To Employer-Imposed  Discipline .................................40

(1)   The Board Erroneously Held That *Weingarten* Rights  Attached to Meetings In Which Employees  Participate Voluntarily..................41

(2)   The Board Erroneously Held That The Nurses  Reasonably Expected That their Appearance Before  the Peer Review Committee Could Result In  Discipline. ...............................45

C.  The Board Erred By Failing to Hold that the Presence of a  Union Representative Would Interfere with Legitimate  Employer Prerogatives. .................................................................48

III.  THE BOARD ERRONEOUSLY HELD THAT THE HOSPITAL UNLAWFULLY FAILED TO PROVIDE INFORMATION .....................49

A.  The Information Requested by the Union Is Not Relevant  To the Union's Representational Duties .................................49

B.  The Board Misconstrued Kansas Law In Holding That The Requested Information Was Not Confidential...........................51

C.  The Hospital Satisfied Its Obligation to Engage In  Accommodative Bargaining. ...............................................54

IV.  THE BOARD ERRONEOUSLY HELD THAT THE RISK MANAGEMENT PLAN'S CONFIDENTIALITY RULE IS OVERBROAD ........................................................55

A.  The Rule Does Not Unlawfully Interfere With NLRA  Protected Activity..............................................................56

B.  The Confidentiality Rule Is Supported By Legitimate  Business Justifications.................................................................................58

V.  THE BOARD ERRED BY AFFIRMING THE ALJ'S  ADMISSION OF TESTIMONY ON PRIVILEGED MATTERS  AND BY AFFIRMING THE ALJ'S RESCISSION OF THE  PROTECTIVE ORDER.........................................................................................59

CONCLUSION .....................................................................................60

# TABLE OF AUTHORITIES[1]

**Page**

**CASES**

*Adams v. St. Francis Reg'l Med. Ctr.*,
  955 P.2d 1169 (Kan. 1998) ............................................................... 5, 54

*\*Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*,
  253 F.3d 19 (D.C. Cir. 2001) ........................................ 5, 26, 27, 57, 58

*Carpenters and Millwrights, Local Union 2471 v. NLRB*,
  481 F.3d 804 (D.C. Cir. 2007) ............................................................. 27

*Crestline Mem'l Hosp. Ass'n. v. NLRB*,
  668 F.2d 243 (6th Cir. 1982 ) .............................................................. 35

*Crittenton Hosp.*,
  343 NLRB 717 (2004) .......................................................................... 41

*\*Detroit Edison Co. v. NLRB*,
  440 U.S. 301 (1979) ........................................................................ 50, 51

*El Paso Electric Co.*,
  355 NLRB 428 (2010) .......................................................................... 44

*Flamingo Hilton-Laughlin*,
  330 NLRB 287 (1999) .......................................................................... 57

*Hill v. Sandhu*,
  129 F.R.D. 548 (D. Kan. 1990) ........................................ 25, 52, 53, 54

*In re Chrysler Corp.*,
  241 NLRB 1050 (1979) ........................................................................ 42

---

[1] Authorities on which Menorah chiefly relies are marked with an asterisk.

*Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers
    v. NLRB,*
    41 F.3d 1532 (D.C. Cir. 1994).........................................................27

*\*Jochims v. NLRB,*
    480 F.3d 1161 (D.C. Cir. 2007)..........................................26, 27, 30, 45

*Kansas State Bd. of Healing Arts v. Foote,*
    436 P.2d 828 (Kan. 1968).............................................................3, 6

*Kansas State Bd. of Nursing v. Burkman,*
    531 P.2d 122 (Kan. 1975).............................................................2, 6

*Lafayette Park Hotel,*
    326 NLRB 824 (1998) ................................................................56

*Lutheran Heritage Village-Livonia,*
    343 NLRB 646 (2004) ................................................................56

*Mountain View Hosp., Inc.,*
    356 NLRB No. 177 (2011) ...........................................................44

*\*Mt. Vernon Tanker Co. v. NLRB,*
    549 F.2d 571 (9th Cir. 1977) .........................................4, 24, 38, 39

*N. Ind. Pub. Serv. Co.,*
    347 NLRB 210 (2006) ................................................................55

*N.Y. Inst. for Educ. of the Blind,*
    254 NLRB 664 (1981) ................................................................30

*New York Shipping v. Federal Maritime Comm'n.*
    854 F.2d 1338 (D.C. Cir. 1988)......................................................35

*NLRB v. ACME Indus. Co.,*
    385 U.S. 432 (1967)..................................................................50

*NLRB v. E.C. Atkins & Co.,*
    331 U.S. 398 (1947)..................................................................35

*NLRB v. Natural Gas Utility Dist. Of Hawkins County,*
    402 U.S. 600 (1971)......................................................... 3, 24, 28, 29, 30, 33, 34

*NLRB v. Princeton Mem'l Hosp.,*
    939 F.2d 174 (4th Cir. 1991) .....................................................................33, 34

*NLRB. v. U.S. Postal Serv.,*
    689 F.2d 835 (9th Cir. 1982) ...............................................................45, 46, 47

*NLRB v. Weingarten,*
    420 U.S. 251 (1975)....................... 1, 4, 24, 25, 37, 38, 39, 40, 41, 42, 45, 48, 49

*Parsons Elec. Co. v. NLRB,*
    976 F.2d 1167 (8th Cir. 1992) ............................................................................51

*Penn. Power Co.,*
    301 NLRB 1104 (1991) .....................................................................................52

*S. Cal. Gas Co.,*
    342 NLRB 613 (2004) .......................................................................................51

*Shoppers Food Warehouse,*
    315 NLRB 258 (1994) .......................................................................................50

*Southern S.S. Co. v. NLRB,*
    316 U.S. 31 (1942)............................................................................................49

*State Board of New Mexico,*
    346 NLRB 674 (2006) ......................................................................29, 31, 32, 33

*Tenneco Automotive, Inc. v. NLRB,*
    716 F.3d 640 (D.C. Cir. 2013)...........................................................................27

*U.S. Postal Service,*
    241 NLRB 141 (1979) ................................................................43, 44, 46, 47

*U.S. Testing Co. v. NLRB,*
    160 F.3d 14 (D.C. Cir. 1998)............................................................................50

*Univ. of Vermont*,
297 NLRB 291 (1989) ...................................................................30

*Yukon-Kuskokwim Health Corp. v. NLRB*,
234 F.3d 714 (D.C. Cir. 2000).............................................24, 35, 36

**STATUTES**

U.S.C. § 160......................................................................................1, 26, 27

29 U.S.C. § 151...................................................................................2, 37

*29 U.S.C. § 152(2) .............................................2, 3, 23, 24, 28, 36

29 U.S.C. § 157...........................................................................26, 37, 55

1997 Kan. Sess. Laws 149 .................................................................53

Kan. Stat. Ann. § 60-437 ............................................................11, 49

Kan. Stat. Ann. § 65-1115 ....................................................................7

Kan. Stat. Ann. § 65-1120 ...............................................................7, 8

Kan. Stat. Ann. § 65-1123 ....................................................................8

Kan. Stat. Ann. § 65-1124 ...............................................................8, 48

Kan. Stat. Ann § 65-1135 .....................................................................8

*Kan. Stat. Ann. § 65-4915 .................................. 10, 11, 23, 49, 52, 53, 54, 57, 59

Kan. Stat. Ann. § 65-4922 ...........................................................12, 30

Kan. Stat. Ann. § 65-4923 .............................................................9, 30

*Kan. Stat. Ann. § 65-4929 .............................................1, 3, 10, 28, 31

Kan. Stat. Ann. § 74-1106 ...............................................................6, 8

Kan. Stat. Ann. § 74-1110 .....................................................................8

**OTHER AUTHORITIES**

Kan. Admin. Regs. § 28-52-1 ...................................................................31

Kan. Admin. Regs § 28-52-4 ..............................................9, 12, 16, 32

Kan. Admin. Regs. § 60-3-109a ....................................................7, 47, 57

Kan. Admin. Regs. § 60-3-110 ................................................................7

## **GLOSSARY**

| Abbreviation | Meaning |
|---|---|
| "ALJ" | Administrative Law Judge Christine E. Dibble |
| The "Committee" or "Peer Review Committee" | Nurse Peer Review Committee at Menorah Medical Center |
| The "Decision" | The August 27, 2015 Decision and Order of the Board in Case Nos. 17-CA-088213 and 17-CA-091192, reported at 362 NLRB No. 193 |
| "General Counsel Exhibit" | Exhibits submitted by Counsel for the General Counsel in the hearing before the ALJ in Case Nos. 17-CA-088213 and 17-CA-091192 |
| "Joint Exhibit" | Exhibits submitted jointly by the parties in the hearing before the ALJ in Case Nos. 17-CA-088213 and 17-CA-091192 |
| "Menorah" or the "Hospital" | Petitioner Menorah Medical Center |
| "Menorah Exhibit" | Exhibits submitted by Menorah Medical Center in the hearing before the ALJ in Case Nos. 17-CA-088213 and 17-CA-091192 |
| "NLRA" or the "Act" | National Labor Relations Act |
| "NLRB" or the "Board" | National Labor Relations Board |
| The "Nursing Board" | Kansas State Board of Nursing |
| The "Plan" | The Risk Management Plan in effect at Menorah Medical Center |
| "Tr." | Transcript from the hearing before the ALJ held on August 6 and 7, 2013 |
| The "Union" | National Nurses Organizing Committee – Kansas/National Nurses United |

## STATEMENT OF JURISDICTION

This is a Petition for Review from an Order of the National Labor Relations Board issued on August 27, 2015.  This Court has jurisdiction to review that Order under 29 U.S.C. § 160(f).

## STATEMENT OF ISSUES

The questions presented by this Petition are whether the National Labor Relations Board erred by:

1.     Exercising jurisdiction over the Kansas medical peer review process whose participants state law designates as "state officers."  Kan. Stat. Ann. § 65-4929(a);

2.     Holding that the National Labor Relations Act ("NLRA" or the "Act") entitles Nurses to union representation, under *NLRB v. Weingarten*, 420 U.S. 251 (1975), at peer review committee meetings where nurses participate in the meetings voluntarily and employees could not reasonably believe that the meetings could lead to disciplinary action by the Hospital;

3.     Holding that the Hospital violated the Act by failing and refusing to provide committee-related information that is confidential and privileged under state law.  Kan. Stat. Ann. § 65-4929(b);

4.     Holding that the Hospital violated the Act by promulgating, maintaining, and enforcing a Risk Management Plan whose language and approval

-1-

was required by the Kansas Department of Health and the Environment; and

5.      Rescinding a protective order covering testimony in this matter about peer review committee meetings where the order was intended to preserve a state law privilege and did not interfere with the Respondent's or Intervenor's presentation of evidence.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Addendum attached to this Brief.

## INTRODUCTION

The National Labor Relations Act was adopted to remedy "[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining."  29 U.S.C. § 151.  The NLRA governs relationships between most private sector employers, their employees, and labor unions and specifically exempts from the National Labor Relations Board's jurisdiction "any State or political subdivision thereof."  29 U.S.C. § 152(2).  The Act has no role in "the business of licensing" medical professionals, which is chiefly "an administrative or legislative function. . ." of the State.  *Kansas State Bd. of Nursing v. Burkman*, 531 P.2d 122, 125 (Kan. 1975).

In the matter before this Court, the NLRB ignored the fundamental distinction between state licensing, on the one hand, and employee discipline on

-2-

the other.  By statute, the State of Kansas requires all hospitals in the State, including the Petitioner, to play a central role in the State's nurse licensure scheme by establishing a Nurse Peer Review Committee ("the Committee") charged with reporting to the Kansas Board of Nursing (the "Nursing Board") certain incidents in which the standard of care may not have been met so that the Nursing Board may conduct its own independent investigation.  The Peer Review Committee and the Nursing Board to which it reports are inseparable; together, they "secure to the people the services of competent, trustworthy practitioners." *Kansas State Bd. of Healing Arts v. Foote*, 436 P.2d 828, 833 (Kan. 1968).  And, critical to this case, the State's licensure scheme is established and operates completely separately from the Hospital's own disciplinary system for its employees.

By ignoring the difference between State licensure schemes and employee discipline, the Board committed numerous reversible errors.  *First* and foremost, the Board lacked jurisdiction because the Committee, in carrying out this licensure function, was acting as an arm of the State under the Supreme Court's decision in *NLRB v. Natural Gas Utility Dist. Of Hawkins County*, 402 U.S. 600, 604-605 (1971).  Indeed, state law expressly provides that members of peer review committees "shall be considered to be state officers. . . .".  Kan. Stat. Ann. § 65-4929(b).  Thus, Section 2(2) proscribes the NLRB from asserting jurisdiction over this case at all.

-3-

*Second*, the NLRB erroneously declared a new right to representation, under *NLRB v. Weingarten*, to Nurses who appear voluntarily before the Committee.  But *Weingarten*, like the NLRA itself, aims to equalize the imbalance of economic power between an employer and its employees.  It has no application to the Peer Review Committee, the purpose of which is not to administer employee discipline but, instead, to assist the State in administering a state licensing scheme aimed at furthering the safe delivery of care in Kansas.  *Mt. Vernon Tanker Co. v. NLRB*, 549 F.2d 571 (9th Cir. 1977) (*Weingarten* does not apply to a captain's investigatory interview of a seaman where the captain is "charged by law for the responsibility for the safety of a vessel.").  And even if *Weingarten* could theoretically apply here, it is established law that there is no *Weingarten* right during the Committee meetings where, as here, the employee's participation is purely voluntary.

*Third*, the Board erroneously held that the Hospital unlawfully failed to provide information to the Union that Kansas law expressly makes confidential. Given that all of the information at issue relates to the Committee's execution of its duty, under Kansas law, to report certain incidents to the Nursing Board in order for the Nursing Board to exercise its licensure function, none of the information is relevant to the Union's duty, under the NLRA, "to police and administer the [collective bargaining] contract."  Decision at 6.  By requiring the Hospital to

-4-

produce confidential and privileged information that was "submitted to or generated by" the Committee, the Board overstepped its authority and jeopardizes the State's declared need to maintain "staff competency by encouraging frank and open discussions and thus improving the quality of medical care in Kansas." *Adams v. St. Francis Reg'l Med. Ctr.*, 955 P.2d 1169, 1187 (Kan. 1998).

　　*Finally*, the Board erroneously held that the Hospital's rule, requiring all personnel to maintain the confidentiality of a narrow category of information that is privileged under Kansas law, interferes with employees' organizational rights under the NLRA.  Given that the rule pertains only to the Committee's obligations under the Kansas nurse licensure laws, it has no bearing on and does not interfere with any NLRA-protected rights.  As this Court has cautioned previously, "[w]e cannot help but note that the NLRB is remarkably indifferent to the concerns and sensitivity which prompt many employers to adopt the sort of rule at issue here." *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 23 (D.C. Cir. 2001).  This sentiment applies with equal force to the entirety of the Decision before this Court's review.

　　For these reasons and others explained in greater detail below, this Court should grant Menorah's Petition and vacate the Board's order.

## STATEMENT OF THE FACTS

I.     **THE NURSING BOARD AND THE PEER REVIEW COMMITTEE**

    A.     **The State of Kansas Maintains a Robust Regulatory Scheme for Nurse Licensure.**

Since 1913, the State of Kansas has maintained a robust regulatory scheme for nurse licensure. *Kansas State Bd. of Nursing v. Burkman*, 531 P.2d 122, 125 (Kan. 1975). As the state's Supreme Court has recognized:

> The goal is to secure to the people the services of competent, trustworthy practitioners. The act seeks to do this through licensure. The licensing by the state, granted only after minimal standards of proficiency are met, amounts to the state's recognition of the licentiate as a qualified practitioner. The continued holding of the license may be taken by the public as official indication those standards are being maintained. The object of both granting and revoking a license is the same – to exclude the incompetent or unscrupulous from the practice of the healing arts.

*Kansas State Bd. of Healing Arts v. Foote*, 436 P.2d 828, 833 (Kan. 1968).[2] To achieve these purposes, Kansas established a regulatory agency, the Nursing Board, which is responsible for licensing Registered Nurses.. Kan. Stat. Ann. § 74-1106 *et seq.* ("Nurse Practice Act"). The Nursing Board is comprised of 11 members, who are appointed by the Governor to serve four-year terms. *Id*. at § 74-1106(a).

---

[2] *See also Burkman*, 531 P.2d at 125 (finding "the general purpose of the nursing act to be essentially the same as that found by this court with respect to other licensing acts").

-6-

Much like a state bar association, the Nursing Board, among other functions, admits applicants to the profession through an examination process and investigates complaints about current licensees. Applicants must have graduated from an approved school of professional nursing and pass a written examination. Kan. Stat. Ann. § 65-1115(c). Applicants can be denied a nursing license for having previously committed a "disqualifying factor," "professional incompetency," or "unprofessional conduct," as defined by Kansas statute and Nursing Board regulation. *Id*. at §§ 65-1115(c); 65-1120; Kan. Admin. Regs. § 60-3-110(a)-(x). As relevant to this case, the Nursing Board has defined "unprofessional conduct" by regulation to prohibit, among 23 other acts, "medication diversion," *i.e.,* the theft of drugs by health care professionals., *Id*. at § 60-3-110(n). Kansas law requires all registered nurses to "be familiar with the Kansas Nurse Practice Act, the standards of practice of the profession and the code of ethics for professional nurses." *Id*. at § 60-3-109a(a).

In addition to determining whether prospective licensees meet the minimum qualifications for entering the profession, the Nursing Board investigates whether conduct by existing licensees could affect their licensure. If an investigation reveals reasonable grounds for believing that a licensee has committed a "disqualifying factor," "professional incompetency" or "unprofessional conduct," as described above, the agency fixes a date and time for proceedings, which are

-7-

conducted in accordance with the Kansas Administrative Practice Act.  Kan. Stat. Ann. §§ 74-1106(d); 65-1123.  Nurses have a right to an attorney during Nursing Board proceedings.  *See, e.g.*  Kan. Stat. Ann § 65-1135(a)(1).  The agency has broad powers in conducting hearings and investigations, including to issue subpoenas and to enjoin unsafe conduct.  *Id.* at §§ 74-1106(d); 65-1123.

If the Nursing Board determines after a hearing that a licensee is culpable of a "disqualifying factor," "professional incompetency" or "unprofessional conduct," the Nursing Board can limit, suspend or revoke a license.  Kan. Stat. Ann. §§ 65-1120(a); 74-1106(c)(4).  The Nursing Board may also issue finds for up $3,000 per violation. *Id.* at § 74-1110.

A nurse whose license the Nursing Board suspends or revokes cannot practice nursing until his or her license is restored.  Discipline by the Nursing Board, however, does not necessarily lead to discipline by an employer.  A nurse whose license the Nursing Board limits, such as by requiring additional supervision, can practice nursing consistent with the Nursing Board's limitations. Even a nurse whose license is suspended or revoked may perform "auxiliary patient care services" under the supervision of a licensed nurse.  Kan. Stat. Ann. § 65-1124(h).  Thus, Nursing Board actions do not obligate employers to discipline employees whose licenses the Nursing Board has limited, revoked, or suspended.

-8-

### B.     The State Board of Nursing Investigates Incidents Reported by Peer Review Committees at Medical Care Facilities

Per state law, Kansas hospitals, such as Menorah, are required to participate in nurse licensure  by maintaining a peer review committee, which must report

> to the appropriate state licensing agency any finding by the committee that a health care provider acted below the applicable standard of care which had a reasonable probability of causing injury to a patient, or in a manner which may be grounds for disciplinary action by the appropriate licensing agency, so that the agency may take appropriate disciplinary measures.

Kan. Stat. Ann. § 65-4923(a)(1).  Incidents that the Committee reviews are termed "reported incidents."  Kan. Admin. Regs. § 28-52-4(b).  The Committee must then assign each reported incident one of four standard of care determinations: (1) "standards of care met"; (2) "standards of care not met, but with no reasonable probability of causing injury"; (3) "standards of care not met, with injury occurring or reasonably probably"; or (4) "possible grounds for disciplinary action by the appropriate licensing agency."  *Id.* at § 28-52-4(a).  Any incidents that qualify as level three or four "shall be considered a 'reportable incident' and reported to the appropriate licensing agency. . . ."  *Id.* at § 28-52-4(b).

Significantly, the Committee's role is limited to reporting "reportable incidents" to the Nursing Board "so that the agency may take appropriate disciplinary measures."  Kan. Stat. Ann. § 65-4923(a)(1).  The Committee report is not provided to the Hospital.  (Tr. 140:21-23; 157:14-19; 247:23-248:1.)

-9-

Accordingly, the Committee's report to the Nursing Board does not constitute

discipline, either under the State licensure scheme or by the Hospital.  Indeed,

investigations that could lead to Hospital-imposed discipline are conducted entirely

separately from the peer review process, pursuant to the Hospital's progressive

discipline policy, by human resources and/or an employee's manager.  (Joint

Exhibit 13; Tr. 284:25-286:25.)

Kansas law explicitly provides that health care providers participating in

peer review committees do so as "state officers":

> Health care providers and review, executive or impaired provider
> committees performing their duties under K.S.A. 65-4922, 65-4923
> and 65-4924 and peer review pursuant to K.S.A. 65-4915 and
> amendments thereto for the purposes expressed in subsection (a) and
> 65-4915 and amendments thereto *shall be considered to be state
> officers* engaged in a discretionary function and all immunity of the
> state shall be extended to such health care providers and committees,
> including that from the federal and state antitrust laws.

Kan. Stat. Ann. § 65-4929(b) (emphasis added).

### C.      The Committee's Proceedings and Information Submitted to or Generated By the Committee Are Confidential and Privileged.

A "peer review officer" is an "individual employed, designated or appointed

by . . . a health care provider group and authorized to perform peer review."  Kan.

Stat. Ann. § 65-4915(a)(4)(a)[3]  At all times material to the instant case, Kansas law

---

[3] The peer review committee that involves the actions of nurses is comprised only
of nurses.  (Tr. 135:23-136:2; Tr. 183:22-184:5.)

has provided as follows:

> [T]he reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity or be admissible in evidence in any judicial or administrative proceeding.  Information contained in such records shall not be discoverable or admissible at trial in the form of testimony by an individual who participated in the peer review process.

Kan. Stat. Ann. § 65-4915(b).  This peer review privilege is held by the Committee, its officers, and the medical facility where the Committee sits.  *Id.*  Consequently, per Kansas statute, the Committee's "proceedings" and documents "submitted to or generated by" the Committee or its officers are privileged and confidential.  *Id.*

Although the privilege is broad, it can also be waived.  In particular, if the holder of the privilege – here, the Committee and its members – has, "without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone," Kan. Stat. Ann. § 60-437, then the privilege is waived.  Thus, the presence of a third party during the Committee's "proceedings" or disclosure of information "submitted to or generated by" the Committee or its officers waives the privilege.

-11-

### D.    The Hospital Has a Risk Management Plan Approved by the State of Kansas That Explains the Peer Review Purpose and Process

As required by statute, Menorah has adopted a Risk Management Plan (the "Plan") that explains the Committee's purpose, duties, and procedures consistent with the foregoing state law.  (Joint Exhibit 1.)  In addition to describing the peer review procedures applicable to Nurses, the Plan describes the peer review committees applicable to other licensed health care providers, including the Medical Staff and Ancillary Services Peer Review Committees.  (*Id*.)  The Hospital is required to submit the Plan to the State Department of Health and the Environment for approval, and "[f]ailure to submit such a plan shall result in denial of the renewal of the facility's license."  Kan. Stat. Ann. § 65-4922(b).  If the State determines that the Plan does not meet the statutory "criteria," the State will disapprove the plan, which the Hospital then must revise.  *Id*. at § 65-4922(d).

Consistent with State law, the Plan provides that the "Nursing Peer review Committee has ultimate reporting responsibility to the State Board of Nursing. The Nursing Peer Review Committee, through the Risk Manager, will report any confirmed reportable incident to the State Board of Nursing as required by law." (Joint Exhibit 1 at 6.)  If a reported incident is potentially reportable, *i.e.*, it potentially qualifies as level 3 or level 4 under Kan. Admin. Regs § 28-52-4, the licensee involved in the incident is "notified in writing of this fact and given the

opportunity to be heard." (*Id*. at 11.) The licensee's appearance before the Committee is entirely voluntary. "Upon receipt of the notice, the affected practitioner will have ten (10) working days to respond to the Risk Manager as to whether he/she wishes to address the Committee." (*Id*. at 6.) Thus, if a licensee chooses not to appear, the peer review officers determine whether a "reported incident" is "reportable" without interviewing the licensee.

Only peer review officers and employees appearing before the committee participate in Committee meetings, which are privileged and confidential under state law. As a result, the Plan cites the statutory privilege and explains that "[a]ll reports and records made pursuant to K.S.A. 65-4921 *et seq*, and K.A.R. 28-52-1 *et seq*. shall be confidential and privileged" and are "are not subject to discovery, subpoena, or other means of legal compulsion for their release to any person or entity and shall not be admissible in any civil or administrative action." (Joint Exhibit 1 at 16.) In addition, the Plan includes the confidentiality provision at issue in this appeal:

> No Hospital employee, Medical Staff Member, or Allied Health Professional shall disclose information concerning reportable incidents except to their superiors, Hospital Administration, the Risk Manager, the appropriate Hospital and Medical Staff committees, legal counsel for the Hospital, or the applicable licensing agencies, unless authorized to do so by the Risk Manager, Administration, or legal counsel.

(*Id*.)

-13-

As required by Kansas law, Menorah's Plan, including the confidentiality provision, was submitted to the Kansas Department of Health and Environment for review and approval in May 2012. (Menorah Exhibit 4.) In July 2012, the Health Department requested certain changes to the Plan, including an additional confidentiality provision requiring the Hospital to keep certain confidential and privileged information relating to the peer review process on file for at least one year. (Joint Exhibit 3; Menorah Exhibit 5.) Following revisions to the Plan by Menorah, the Department approved in February 2013 the revised Plan, which incorporated the expanded confidentiality provision required by the State. (Menorah Exhibits 6 – 8; Joint Exhibit 3.)

## II.    PEER REVIEW COMMITTEES DO NOT ISSUE DISCIPLINE

Kansas law tasks the Committee with reporting certain patient care incidents, as defined by regulation, to the Nursing Board. The Committee does not issue discipline. Indeed, the Hospital's human resources department, in conjunction with a nurse's department manager, conducts investigations pursuant to the Hospital's separate three-step progressive discipline policy. (Joint Exhibit 13.) While the same patient incident could, ultimately, be both "reportable" to the Nursing Board *and* violate Menorah policy, separate investigations are conducted. (Tr. 140:1-11; 138:7-10.) The Committee determines whether a "reportable incident" has occurred, while human resources assesses whether Menorah policies

-14-

or procedures were followed.  (*Id.*)  The Union participates at all three steps of the

progressive discipline policy and also participates in the grievance procedure under

the applicable collective bargaining agreement.  (Tr. 287:1-21.)  Historically,

however, the Union has not participated in Committee proceedings.

Given the broad privilege that protects the Committee's "proceedings" and

documents "submitted to or generated by" the Committee, the Committee does not

share information about reported incidents except as required by law.  Disclosure

of privileged information risks waiving the peer review privilege.  Thus, the

Committee does not share information with human resources or otherwise

recommend that the Hospital investigate a matter or issue discipline against the

Nurse at issue.  (Tr. 186:6-9; 140:21-23.)

### III. THE COMMITTEE REVIEWED REPORTED INCIDENTS INVOLVING NURSES SHERRY CENTYE AND BRENDA SMITH.

#### A. <u>Incident Involving Sherry Centye</u>

In May 2012, while reviewing information pulled from the Hospital's

electronic medication monitoring system, a manager discovered that Nurse Sherry

Centye had removed morphine in April 2012 from the Hospital's automated

medication dispensing system but had not documented that the drug was actually

administered to a patient.  (Menorah Exhibit 22; Tr. 318:2-321:12; Tr. 325:22-

327:1.)  The incident was subsequently referred to the Nurse Peer Review

-15-

Committee.

Centye was informed by letter dated May 4, 2012, that the reported incident would be reviewed by the Committee at its next meeting on May 31, 2012, and that she could address the Committee in person or submit a written statement in lieu of appearing in person.  (Joint Exhibit 4.)  The letter tracks the statutory language and specifically stated that she was being invited to attend the Committee to discuss a situation in which Centye "may have exhibited unprofessional conduct as defined by the Kansas Nurse Practice Act . . . ."  (*Id.*)  The letter stated that the "conduct has preliminarily been determined to be a Standard of Care Level 4: grounds for disciplinary action," and explained that "[a]s governed by Kansas Statute, a final Standard of Care Level 4 determination must be reported to the Kansas Board of Nursing."  (*Id.*)  As Jennifer Cross, the Hospital's Risk Manager, testified before the Administrative Law Judge ("ALJ"), "grounds for disciplinary action" does not refer to disciplinary action by the Hospital.  Rather, this language is taken directly from the Kansas risk management statutes and regulations and refers to "grounds for disciplinary action by the applicable licensing agency."  (Tr. 197:8-19; Kan. Admin. Regs. § 28-52-4(a)(1)-(4).)

The letter informed Centye that she was not required to attend or participate in the peer review meeting.  Rather, the letter provided Centye "the opportunity to speak with the Nursing Peer Review Committee *if you choose*."  (Joint Exhibit 4

-16-

(emphasis added).)  Centye was also free to "submit a written response to the Committee if you wish in lieu of an appearance."  *Id*.  The letter also assured Centye that any "[a]ppearance before the Committee and any discussions that take place are confidential and protected under State Peer Review privileges."  (*Id*.)  Likewise, a written response submitted in lieu of her attendance "remains confidential and is also protected by State Peer Review privileges."  (*Id*.)

Centye chose to attend the May 31, 2012, Committee meeting rather than submit a written response.  (Tr. 204:11-13.)[4]  After the meeting, Jennifer Cross, the Hospital's Risk Manager, notified Centye by letter that the Committee reduced the standard of care determination to a "Standard of Care Level 2: standard of care not met, but with no reasonable probability of causing injury."  (Joint Exhibit 5.)  The letter explained that "a Standard of Care Level 2 is not a 'reportable incident' to the Kansas State Board of Nursing."  (*Id*.)  The letter made no reference to any discipline that was or would be imposed by the Hospital.  (*Id*.)

---

[4] There was conflicting testimony as to whether both Centye and Smith requested a Union representative for their respective Committee meetings.  Centye testified that she requested a Union representative before the meeting, while Smith testified that she requested a representative during the meeting.  The Hospital's witness denied that either Nurse requested a representative.  (*Compare* Tr. 26:7-8; 56:10-16 *and* 203:19:21-204:3 (Centye); (*Compare* Tr. 77:14-25 (protective order) *and* Tr. 196:14-17; 211:11-15; 212:11-17 (protective order) (Smith)).  However, that issue is irrelevant to the matter before the Court, given that *Weingarten* rights do not attached to the Committee meetings at issue.

### B.      Incidents Involving Brenda Smith

### (1)      April 2012 Incidents Involving Brenda Smith

In May 2012, Smith's manager reviewed data from the Hospital's medication dispensing system that showed a series of potential medication diversion incidents occurring in April 2012.  (Menorah Exhibit 23; Tr. 327:20-333:14.)  These incidents were referred to Menorah's Medication Diversion Prevention Committee and then to the Peer Review Committee for further review. (Joint Exhibit 6; Tr. 334:3-5.)

On May 11, 2012, Cross notified Smith via letter that the conduct at issue in the April 2012 incidents "had preliminarily been determined to be a Standard of Care Level 4: grounds for disciplinary action ," and explained that "[a]s governed by Kansas Statute, a final Standard of Care Level 4 determination must be reported to the Kansas Board of Nursing."  (*Id*.)  The letter informed Smith that she had the opportunity to discuss the April 2012 incidents at the Committee's next meeting on August 9, 2012.  (Joint Exhibit 7.)  In the letter, Smith, like Centye, was advised that her attendance at the meeting was voluntary and that, if she chose to address the Committee, she could do so in person or in writing.  (*Id*.)

Smith admitted that, prior to attending the August 9, 2012, Committee meeting, she had an understanding "that the potential result of the meeting was to have the peer review committee make a reportable finding to the State Board of

Nursing" and that she "assumed" that "the State Board of Nursing would then make its own determination as to whether something should occur with [her] license, such as being impaired or revoked." (Tr. 91:25-92:12.) Similarly, when asked what she "believed[] could happen with regard to [her] relationship to [Menorah]" based upon her reading of the May 11, 2012, letter from Cross, Smith responded "I think I was thinking more along the lines of the Kansas State Board of Nursing more than what kind of discipline would come down from the hospital." (Tr. 103:22-105:3.)

The Committee met on August 9, 2012, to discuss the April 2012 incidents involving Smith. (Tr. 211:1-7.) Smith chose to attend the meeting. (Tr. 73:23-74:4.)

After the August 9, 2012 Peer Review Committee meeting, Cross informed Smith in writing that the Committee had determined to reduce the standard of care determination to a "Standard of Care Level 2: standard of care not met, but with no reasonable probability of causing injury." (Joint Exhibit 8.) The letter explained that "a Standard of Care Level 2 is not a 'reportable incident' to the Kansas State Board of Nursing." (*Id*.) The letter made no reference to any discipline that was or would be imposed by the Hospital. (*Id*.)

### (2)    July 2012 Incidents Involving Smith

In August 2012, Menorah's medication monitoring system again indicated potential diversion of narcotics by Smith in July 2012. Smith's manager referred the data from the monitoring system to the Medication Diversion Prevention Committee, which referred the potential diversion incidents to the Peer Review Committee. (Menorah Exhibits 24, 25; Tr. 248:20-23; 249:21-24.)

On September 6, 2012, Cross notified Smith via letter that the July 2012 incidents "had preliminarily been determined to be a Standard of Care Level 4: grounds for disciplinary action," and explained that "[a]s governed by Kansas Statute, a final Standard of Care Level 4 determination must be reported to the Kansas Board of Nursing." Cross offered Smith the option to attend the October 4, 2012, Committee meeting where Smith's July issues would be reviewed. (Menorah Exhibit 11.) As in her previous letters to Centye and to Smith, Cross assured Smith that her participation was voluntary, that she could submit a written statement in lieu of attending, and that whether she attended in person or submitted a written response, her participation would be confidential and privileged under Kansas law. (*Id*.)

Following an exchange of correspondence and an in person meeting between Smith and Cross (Tr. 253:7-255:1; Menorah Exhibits 12 and 14), Smith decided not to attend the Committee meeting and instead submitted a comprehensive

written response to the alleged incidents.  (Menorah Exhibit 14.)

The Committee met on December 13, 2012.  (Tr. 262:11-13.)  After considering Smith's written statement, the Committee determined that the incidents should be referred to the Nursing Board.  (Tr. 262:11-25.)  Smith was notified of this decision by letter dated December 20, 2012.  (Menorah Exhibit 16.) In the letter, Smith was notified that a "Standard of Care Level 3 and 4 is a 'reportable incident' to the Kansas State Board of Nursing" and that the incident would be reported accordingly.  (*Id*.)  Additionally, Smith was informed that "it is important to know that the Kansas Board of Nursing will exercise its own discretion as to whether this incident will be investigated and what, if any, actions will be taken."  (*Id.*)

## IV.     THE UNION REQUESTED CONFIDENTIAL INFORMATION THAT IS SUBJECT TO THE PEER REVIEW PRIVILEGE.

On June 1 and June 5, 2012, the Union requested a substantial amount of information about the peer review process and a written warning issued to Centye for an issue that was unrelated to the medication diversion incidents that were the subject of the peer review meeting.  (Joint Exhibit 9.)  The Hospital responded to the Union's requests on June 27, July 6, and  July 26, 2012.  (Joint Exhibits 10, 12, and 13.)  The Hospital also conferred with the Union twice to discuss the requests, in person on June 26, 2012 and via telephone on June 29, 2012.  (Tr. 113:19-115:18.)  The Hospital provided all requested information regarding Centye's

-21-

written warning, which the Union stated was "the most important information we need." (Joint Exhibit 10.) As part of its responses to the Union, however, Menorah informed the Union that information regarding the peer review process is privileged and confidential under Kansas law. Moreover, given that peer review officers merely perform their statutory duty and do not issue or recommend discipline, the Hospital explained that information about the Committee was not relevant to the Union's duty to administer the collective bargaining agreement. (Joint Exhibit 10.)

Nonetheless, the Hospital provided a significant amount of information about the peer review process. The Hospital explained to the Union the peer review privilege and quoted the statutory language. (Joint Exhibit 12 (quoting Kan. Stat. Ann. § 65-4915(b).)

The Hospital also informed the Union that peer review is purely a state function "established under state law" that is "independent and separate from any internal, hospital initiated disciplinary investigation or action." (*Id*.) Given the structure of the peer review system – which, as noted, is irrelevant to Hospital discipline – no responsive information existed in response to the Union's request for discipline that the Committee had issued. As the Hospital explained, the Committee's purpose is "to evaluate whether a reportable incident committed by an RN requires disclosure to the Kansas State Board of Nursing," (*Id*.); it does not

mete out discipline.  The Hospital also provided to the Union a copy of the Risk
Management Plan, which details the procedures that peer review officers follow
and describes the types of incidents that require a report to the Nursing Board.  (Tr.
122:9-11; Joint Exhibit 1.)

The Hospital did not provide to the Union privileged information that was
"submitted to or generated by" the Committee.  Kan State. Ann. § 65-4915(b).
Nonetheless, the Hospital met with the Union in order to answer the Union's
questions about peer review and to provide as much non-privileged information as
possible.  Moreover, by providing the Union with all requested information about
the written warning issued to Centye under the Hospital's progressive discipline
policy, the Hospital produced all information relevant to the Union's ability to
administer the collective bargaining agreement.

## SUMMARY OF ARGUMENT

Simply put, the NLRA does not apply to state licensure proceedings.
Section 2(2) of the Act prohibits the NLRB from asserting jurisdiction over this
case and interfering with Kansas's statutory and regulatory framework that governs
Nurse licensure and, accordingly, all of the events at issue here.  The Decision
below contravenes the NLRA as interpreted both by the federal appellate courts
and by the NLRB itself and should be reversed.

*First*, the NLRB erred by asserting jurisdiction over this case.  Section 2(2)

-23-

of the Act excludes from the Board's jurisdiction "any State or political subdivision thereof. . . .".  29 U.S.C. § 152(2).  The Peer Review Committee was established by Kansas statute as an administrative arm of the Nursing Board, a state agency, and is administered by peer review officers who report directly to the state agency, whose members are gubernatorial appointees.  *NLRB v. Natural Gas Utility District of Hawkins County*, 402 U.S. 600, 604–605 (1971).  In addition, the Board committed reversible error by failing even to consider the Hospital's argument that the NLRB's assertion of jurisdiction conflicts with Kansas's regulatory nurse licensure scheme.  *Yukon-Kuskokwim Health Corp. v. NLRB*, 234 F.3d 714, 718 (D.C. Cir. 2000).

*Second*, the Board erred by holding that the Hospital violated employees' rights under *NLRB v. Weingarten,* 420 U.S. 251 (1975).  Given that *Weingarten*, like the Act from which it inheres, aims to equalize the imbalance of economic power that exists when an employer coerces employee attendance at an investigatory interview, *Weingarten* does not apply to Peer Review Committee meetings.  In these meetings, peer review officers do not mete out employee discipline; instead they discharge a statutory duty in the nurse licensure scheme to further the safe delivery of care in Kansas.  *See Mt. Vernon Tanker Co. v. NLRB*, 549 F.2d 571, 575 (1977) (reversing the Board, the Court held that *Weingarten* does not apply to a captain's investigatory interview of a seaman where the captain

-24-

is "charged by law with responsibility for the safety of a vessel").  Even assuming

*arguendo* that *Weingarten* does apply, the Hospital did not violate the Nurses'

rights where their appearance at Committee meetings was voluntary and could not

reasonably lead to discipline by the Hospital and where applying *Weingarten*

would interfere with legitimate employer prerogatives established by Kansas law.

*Weingarten*, 420 U.S. at 258.

*Third*, the Board erred by holding that the Hospital unlawfully failed to

produce confidential information about the Committee.  The information has no

bearing on the Union's statutory duties to represent the bargaining unit and is

therefore irrelevant.  In addition, the Board's holding that the information is not

confidential under the NLRA rests on a federal district court opinion interpreting

an outdated version of Kansas's peer review statute.  *Hill v. Sandhu*, 129 F.R.D.

548 (D. Kan. 1990).  Under the amended and significantly expanded version of the

privilege that has been in effect since 1997, the requested information is privileged

and therefore confidential.  Given this, the Hospital more than satisfied any

obligation it may have had to bargain over the Union's requests.

*Fourth*, the Board erred by holding employees would reasonably interpret

the State-approved confidentiality rule in the Risk Management Plan as restricting

employees' NLRA-protected right to discuss terms and conditions of employment.

The rule tracks the language of the peer review statute by limiting discussion of

"reportable incidents" in order to preserve the peer review privilege. This Court has held that employees do not reasonably construe work rules as prohibiting protected activity where the rule was promulgated in order foster compliance with other statutes. *Adtranz ABB Daimler-Benz Transp., N.A. v. NLRB*, 253 F.3d 19, 25-28 (D.C. Cir. 2001). Even if the work rules did infringe on Section 7 activity, the rules remain justified by the Hospital's legitimate business interest in maintaining the peer review privilege.

*Fifth*, and finally, the Board erred by affirming the Administrative Law Judge's holdings that overruled the Hospital's objections to testimony concerning matters protected by the statutory peer review privilege and that revoked a previously-granted protective order to limit disclosure of privileged information. The Board's holdings are based on its misapplication of a version of the peer review privilege statute that was materially amended in 1997.

## STANDING

Pursuant to 29 U.S.C. § 160(f), Menorah Medical Center has standing to seek review in this Court as an aggrieved party to a final order of the Board.

## STANDARD OF REVIEW

This Court will not uphold an NLRB decision that "has no reasonable basis in law, fails to apply the proper legal standards, or departs from established precedent without reasoned justification." *Jochims v. NLRB*, 480 F.3d 1161, 1167

-26-

(D.C. Cir. 2007) (citation omitted). If "'the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case,'" the Decision must be set aside. *Id*. (citation omitted). While the NLRB must apply its precedent faithfully, "[w]here, as here, the NLRB adopts an unreasonable position, it can find no solace in the fact that it made the same mistake in prior cases." *Adtranz*, 253 F.3d at 27.

NLRB findings that are not supported by "substantial evidence" must be set aside. 29. U.S.C. § 160(e), (f). The reviewing court must assess the "whole record," meaning, its analysis must consider not only the evidence supporting the Board's decision but also whatever in the record fairly detracts from its weight. *Tenneco Automotive, Inc. v. NLRB*, 716 F.3d 640, 647 (D.C. Cir. 2013) (citation omitted). Where contradictory evidence exists, the Board must "explain why it rejected evidence that is contrary to its finding." *Carpenters and Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007) (citation omitted). "Pursuant to this standard of review, a reviewing court . . . does not function simply as the Board's enforcement arm. It is [the Court's] responsibility to examine carefully both the Board's findings and its reasoning. . . ." *Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1537 (D.C. Cir. 1994) (internal quotation marks omitted).

# ARGUMENT

## I.    THE BOARD ERRED BY ASSERTING JURISDICTION OVER THIS DISPUTE.

Section 2(2) of the Act excludes from the Board's jurisdiction "any State or political subdivision thereof. . . .".  29 U.S.C. § 152(2).  An entity is a State political subdivision if it is "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *Hawkins County*, 402 U.S. at 604–605.  Here, the Peer Review Committee is operating not pursuant to the Hospital's employee disciplinary process, but rather, as an arm of the State's licensure function.  Given that the Committee's sole purpose is to execute a key role in State licensure, it does not control matters relating to the employment relationship.  As State law explicitly provides, the members of the Committee act as "state officers engaged in a discretionary function. . . ." of the State.  Kan. Stat. Ann. § 65-4929(b).  Consequently, the peer review committee qualifies as a political subdivision under either prong of the *Hawkins County* test.

### A.    The Peer Review Committee Is Created Directly By The State of Kansas And Acts As An Administrative Arm of the Government.

Kansas law requires the Committee to play a key role in the State's nurse licensure framework by reporting directly to the Nursing Board, a State agency,

-28-

incidents that could affect a Nurse's license to practice. Thus, the Committee acts as an administrative arm of the government of Kansas and is exempt from the Board's jurisdiction under the first prong of the *Hawkins County* test.

The Board's decision in *State Bar of New Mexico*, illustrates why this is so. 346 NLRB 674 (2006). In *State Bar of New Mexico*, the NLRB addressed whether a state bar association was a political subdivision of the State of New Mexico under the first prong of the *Hawkins County* test. In that case, the state's legislature had passed legislation, in 1925, to create the state bar association as an "agency of the New Mexico Supreme Court." *Id*. at 676. In 1978, however, the legislature repealed the 1925 statute and replaced it with legislation "defining the Board of Bar Commissioners and the State Board of Bar Examiners as 'bodies of the judicial department.'" *Id*. The state Supreme Court simultaneously implemented Rule 24-101, creating the State Bar. *Id*. Thus, after 1978, the state bar association was not created by the state legislature but rather by the rule of the state's highest court. The Board still held that the state bar association was "a direct creation of State government" and therefore exempt from NLRB jurisdiction under Section 2(2) of the Act. *Id*.

In reaching its conclusion, the Board considered several factors that are relevant here. The state bar association "was created to assist the judicial branch of the State of New Mexico in regulating the legal profession," and "fulfills

regulatory functions on behalf of the New Mexico Supreme Court." *Id*. at 677.  In

addition, the state supreme court's implementing rule "controls the governing

structure of the State Bar" and "exercises substantial control over the State Bar's

priorities and operations." *Id*.

As explained further below, the Peer Review Committee at Menorah meets

prong one of the *Hawkins County* test for the same reasons as the State Bar.  The

Board committed reversible error by holding otherwise.  *Jochims*, 480 F.3d at 1167

(holding that NLRB decision was "fatally flawed" where "the Board misapplied its

own precedent").

### (1)     The Peer Review Committee Was Established by the State of Kansas.

Kansas law requires the Hospital to have a peer review committee.  Kan.

Stat. Ann. §§ 65-4922, 65-4923(a)(2).  Thus, but for Kansas statute, the Committee

at issue here would not exist.

### (2)     The Peer Review Committee Was Established For The Sole Purpose of Assisting the State Board of Nursing in Regulating the Nursing Profession.

Entities created by statute in order to discharge a state function are exempt

from the NLRB's jurisdiction.  *See, e.g. Univ. of Vermont*, 297 NLRB 291 (1989)

(university created by Vermont legislature); *N.Y. Inst. for Educ. of the Blind*, 254

NLRB 664, 667 (1981) (corporation formed by New York legislature).  In *State*

*Bar of New Mexico*, for instance, the Board noted that the Supreme Court's

-30-

implementing rule "explicitly sets forth the purposes of the State Bar, which include aiding the courts in improving the administration of justice" and "encouraging the and assisting in the delivery of legal services," among other responsibilities. 346 NLRB at 677. Here, the "legislature of Kansas recognizes the importance and necessity of providing and regulating certain aspects of health care delivery in order to protect the public's general health, safety, and welfare. Implementation of risk management plans and reporting systems . . . and peer review . . . effectuate this policy." Kan. Stat. Ann. § 65-4929(a). Thus, Kansas law designates Committee members as "state officers engaged in a discretionary function" while "performing their duties." *Id*. at § 65-4929(b). The Committee, like a state bar association, assists the state's licensing body in its primary role of regulating a licensed profession. Indeed, this is the Committee's sole function.

### (3)   The State of Kansas Has Significant Control over the Committee's Governing Structure.

The Board in *State Bar of New Mexico* reasoned that the New Mexico Supreme Court's implementing rule "controls the governing structure of the State Bar." 346 NLRB at 677. Here, Kansas likewise requires the Hospital to submit for the State Department of Public Health and Environment's approval a "description of involvement and organizational structure of medical staff as related to [its] risk management program, including the names and titles of medical staff members involved in [the] investigation and review of reportable incidents." Kan.

-31-

Admin. Regs. § 28-52-1(e)(4)(C).  If the State determines that the risk management plan is somehow deficient, it requires revisions from the Hospital.  Thus, the State has significant control over the Committee's structure.  Indeed, after Menorah submitted its Plan for the State's approval, the State required Menorah to revise and resubmit the Plan, indicating the State of Kansas's active oversight of the licensure program.

> **(4)     The State of Kansas Exercises Substantial Control Over the Nursing Board's Priorities and Operations.**

In *State Bar of New Mexico*, the state exercised significant control over the bar association primarily because the Supreme Court's implementing rule permitted the state bar to write and adopt its own bylaws, while retaining jurisdiction to review whether any bylaws are "inconsistent with these Rules" and therefore "invalid."  346 NLRB at 677.  As described above, while Kansas law does not detail the exact verbiage or procedures of the peer review process, it nonetheless requires that the peer review procedures, as set forth in the Risk Management Plan, conform to the requirements of Kansas statute and regulations. The statutory regime in Kansas, moreover, goes one step further than New Mexico's judicial rule by prescribing the peer review committee's sole function, *i.e.,* to report to the Nursing Board only "reportable" incidents, *i.e.*, those with a level three or level four standard of care determination. Kan. Admin. Regs.  § 28-52-4(b).

In sum, the Peer Review Committee, even more clearly than the State Bar Association, was "created pursuant to State statute to discharge a State function" and "exists to fulfill a State purpose." *State Bar of New Mexico*, 346 NLRB at 678 (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 360 (1977)). As a result, the Peer Review Committee is a political subdivision under the first prong of the *Hawkins County* test.

### B.   The Peer Review Committee Is Administered By Individuals Who are Responsible to Public Officials.

Although an entity is exempt from the Board's jurisdiction if it meets either prong of the *Hawkins County* test, the Peer Review Committee easily meets the second prong as well.

An entity is an exempt political subdivision under the second prong if "its policy-making officials have 'direct personal accountability' to public officials or to the general public.'" *NLRB v. Princeton Mem'l Hosp.*, 939 F.2d 174, 178 (4th Cir. 1991) (citing *Cape Girardeau Care Center*, 278 NLRB 1018, 1019 (1986)). In that case, an elected body, the local municipal council selected the board of directors of Princeton Community Hospital, which operated a separate facility, Princeton Memorial Hospital, the putative employer, that had its own board of directors. *Id.* The bylaws of Princeton Memorial Hospital, in turn, provided that its directors were selected from and subject to removal by Princeton Community's Hospital's board of directors. *Id*. at 175-76. Thus, the putative employer's

governing body was not directly accountable to public officials, *i.e.*, the municipal council.  In addition, the putative employer's internal bylaws, rather than statute or regulation, set forth the manner in which its governing body was selected.  *Id*. Nonetheless, the Fourth Circuit still held that Princeton Memorial Hospital was a state political subdivision.  *Id*. at 175.

Here, as in *Princeton*, the state does not specify the Committee's composition. Unlike in *Princeton*, however, there is no intermediary between the putative employer and the public officials.  Rather, state law requires that the Committee report "reportable incidents" directly to the Nursing Board, public officials appointed by the Governor of Kansas.  In addition, Kansas law requires that the Hospital submit its Risk Management Plan to the State for approval. "Where, as here, it is clear that governmental authority is present, the key point is simply that Congress did not intend for the NLRB's jurisdiction to reach such an entity."  *Princeton*, 939 F.2d at 178.  The NLRB thus lacks jurisdiction over this dispute under either prong of *Hawkins County*.

## C.    The Board Neglected to Consider the Hospital's Argument that the NLRB Lacks Jurisdiction Under Section 2(2) of the Act.

For the reasons explained above, the Board lacked jurisdiction over this dispute.  But, at a minimum, the Board erred by completely ignoring this threshold jurisdictional question.  Here, although the Hospital has asserted throughout these

-34-

proceedings that the NLRB lacked jurisdiction to hear this dispute, (*see* First

Amended Answer at 5; Exceptions to ALJ's Decision at 3-4; Hospital's Brief In

Support of Its Exceptions at 27-31), the NLRB completely ignored this

jurisdictional issue in its Decision and thus committed reversible error.

　　　　Generally, the Board's rulings on its own jurisdiction are entitled to

deference. *See NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 403-04 (1947). The

Board is entitled to no deference, however, based on a showing of "compelling

evidence that it has failed to measure up to its responsibility in adequately

weighing the interests for and against exercising jurisdiction." *Crestline Mem'l*

*Hosp. Ass'n. v. NLRB*, 668 F.2d 243, 245 (6th Cir. 1982 ). This is particularly true

when, as here, a party asserts that exercising jurisdiction would "conflict with

another statutory regime." *Yukon-Kuskokwim Health Corp. v. NLRB*, 234 F.3d

714, 718 (D.C. Cir. 2000). As this Court has explained:

> An agency, faced with alternative methods of
> effectuating the policies of the statute it administers, (1)
> must engage in a careful analysis of the possible effects
> those alternative courses of action may have on the
> functioning and policies of other statutory regimes, with
> which a conflict is claimed; and (2) must explain why the
> action taken minimizes, to the extent possible, its
> intrusion into policies that are more properly the province
> of another agency or statutory regime.

*New York Shipping v. Federal Maritime Comm'n*. 854 F.2d 1338, 1370 (D.C. Cir.

1988). In *Yukon-Kuskokwim* this Court held that the Board committed reversible

-35-

error because it failed to adequately address a Native American tribe's argument

that the Board lacked jurisdiction under Section 2(2).  234 F.3d at 718. Although

the Court upheld the Board's conclusion that the tribe was not a political

subdivision of the state, the Board failed to address the tribe's argument that it was

exempt under Section 2(2) because the tribe operated a federal hospital pursuant to

the Indian Self-Determination Act.  *Id*. at 717-18. In *Yukon*, the Board "mentioned

but dismissed" this argument in a "single sentence."  *Id*. at 717.  As a result, the

Court concluded that the "Board's inadequate attention to the ISDA requires that

we remand this matter to the agency for further consideration."  *Id*. at 718.  The

Court required the Board "to consider what allowance, if any, the NLRA must

make in order to accommodate federal Indian law, as reflected in the ISDA."  *Id*.

In *Yukon*, the Board at least devoted a single sentence to the tribe's

argument.  Here, the Board wholly abdicated its responsibility to consider the

Hospital's argument that the NLRB lacks jurisdiction under Section 2(2).  Like in

*Yukon*, the Hospital has asserted, and continues to assert, that exercising

jurisdiction would interfere the regulatory scheme set forth in Kansas law,

including by essentially requiring all state hospitals with unionized workers to

waive the statutory peer review privilege whenever a union requests privileged

information or when an employee requests a *Weingarten* representative. As

described in Section II(C), *infra*, for instance, the presence of a union

representative in peer review meetings would waive the statutory privilege that attaches to the deliberations of those meetings. Therefore, if the Court chooses not to decide the jurisdictional issue, the Board's wholesale failure to consider the Hospital's jurisdictional argument demands remand of the Decision before the Court's review.

## II. THE BOARD ERRED BY HOLDING THAT *WEINGARTEN* RIGHTS APPLY IN CONFIDENTIAL PEER REVIEW MEETINGS.

In concluding that the Hospital violated Nurse Centye's and Nurse Smith's rights under *NLRB v. Weingarten*, 420 U.S. 251 (1975), the Board rejected the Hospital's argument that the Nurses were not entitled to a union representative because their participation was voluntary and because the employees could not have reasonably believed that the meetings could lead to discipline. *Weingarten* rights do not apply to peer review meetings, and, even if they did, the Board misconstrued *Weingarten* in holding that the Hospital violated *Weingarten* here.

### A. The Board's Extension of *Weingarten* Rights to Licensure Proceedings Is Inconsistent with the NLRA.

The NLRA aims to equalize the "inequality of bargaining power between employees . . . and employers." 29 U.S.C. § 151. Thus, Section 7 of the NLRA establishes employees' right to engage in "concerted activities for . . . mutual aid and protection." *Id*. at § 157. The *Weingarten* right, in turn, "inheres in § 7's guarantee of the right of employees to act in concert for mutual aid and protection"

because the denial of a union representative dilutes an employee's "right to act collectively to protect his job interests." *Weingarten*, 420 U.S. at 256-57.

Thus, in *Weingarten*, Leura Collins, an employee of a retail store's lunch counter, was accused of stealing several pieces of chicken valued at $2.98. *Id*. After the employer concluded that Ms. Collins had not, in fact, stolen the chicken, Ms. Collins "burst into tears and blurted out that the only thing she had ever gotten from the store without paying for it was her free lunch." *Id*. at 255. Given that the employer did not offer employees' free lunch at the store in question (but did offer free lunches to employees of the location from which Ms. Collins had transferred), the store manager, along with a security guard, "closely interrogated Collins about violations of the policy," denied her requests for a union representative, and directed her to repay the company $160 for lunches. *Id.* Concurring with the Board that the employer coercively exercised its economic power against a single employee, the Supreme Court upheld the Board's decision that union representation is necessary "at an investigatory interview which the employee reasonably believes might result in disciplinary action" in order to address this imbalance of power. *Id*. at 252-53.

*Weingarten* has no applicability where the presence of a union representative would do nothing to address the imbalance of economic power between an employer and an employee. The Ninth Circuit recognized this concept in *Mt.*

*Vernon Tanker Co. v. NLRB*, 549 F.2d 571 (1977). In that case, the court held that the NLRA does not provide *Weingarten* rights during an investigatory interview between a captain and a seaman under his or her authority:

> A charge of seaman disobedience during the course of a voyage is not an assertion of "economic power" on the part of an employer; it does not involve the ongoing struggle between labor and management in which the Board appropriately can intervene in an effort to redress perceived imbalances. Rather, such a charge is an assertion of disciplinary authority on the part of one **charged by law with responsibility for the safety** of a vessel.

*Id*. at 575 (emphasis added).

Here, the Hospital is not asserting "economic power" in the peer review meetings at issue. Rather, the Committee's sole function is to assist the Nursing Board's state licensing functions. In other words, as in *Mt. Vernon Tanker*, the Peer Review Committee and its officers are "charged by law with responsibility for the safety" of patients and the delivery of safe patient care in the State of Kansas. *Weingarten* rights, therefore, do not apply. *See also* Decision at 10 ("[Peer Review] Committees are not directly concerned with the employee-employer relationship but with the employee's status with the state licensing agency.") (Member Johnson, dissenting).

Despite the longstanding and widespread use of peer review procedures throughout the country, the Board has never held that *Weingarten* rights apply in a

peer review process.[5]  This remains appropriate here because the Hospital

maintains a separate progressive discipline policy, administered by human

resources in conjunction with an employee's manager.  Consistent with

*Weingarten*, the Union participates in all steps of the progressive discipline process

and also participates in the grievance procedure under the applicable collective

bargaining agreement.  Thus, while *Weingarten* does not apply to peer review,

employees' *Weingarten* rights are appropriately vindicated through the Union's

participation in investigatory interviews that could lead to Hospital-imposed

discipline pursuant to Menorah's progressive discipline policy.

> ### B.   *Weingarten* Rights Do Not Apply To Peer Review Interviews Where Employees Participate Voluntarily And That Could Not Reasonably Lead To Employer-Imposed Discipline

In any event, even if *Weingarten* applied to the peer review process

generally – and it does not –it still could not apply in this case.  Even where the

*Weingarten* right properly arises, it is not without limitations, several of which

apply here.  *First*, the right does not apply where the employer does not require the

employee to participate in the interview:

> The employer has no obligation to justify his refusal to
> allow union representation, and despite refusal, the

---

[5]As the amici national and state hospital associations stated in their brief before the Board, peer review has existed for over 60 years. (Brief for Amici American Hospital Association, et al. at 4.)  All 50 states and the District of Columbia have enacted laws governing peer review.  (*Id*. at 7-8.)

> employer is free to carry on his inquiry without
> interviewing the employee, and thus leave to the
> employee the choice between having an interview
> unaccompanied by his representative, or having no
> interview and forgoing any benefits that might be derived
> from one.

*Weingarten*, 420 U.S. at 258. *Second*, the employee's "right to request

representation as a condition of participation in an interview is limited to situations

where the employee reasonably believes the investigation will result in disciplinary

action." *Id*. at 257. And *third* "exercise of the right may not interfere with

legitimate employer prerogatives." *Id*. at 258.

Under these standards, the Board erred by extending *Weingarten*'s

applicability to the nurse licensure proceedings at issue here.

### (1)    The Board Erroneously Held That *Weingarten* Rights Attached to Meetings In Which Employees Participate Voluntarily.

The law is clear that employees have no *Weingarten* rights during meetings

that employees attend voluntarily.  As the Supreme Court explained in *Weingarten*

itself, "it is a serious violation of the employee's individual right to engage in

concerted activity by seeking the assistance of his statutory representative if the

employer denies the employee's request and ***compels the employee to appear***

unassisted at an interview which may put his job security in jeopardy."

*Weingarten*, 420 U.S. at 257 (quoting *Mobil Oil Corp.*, 196 NLRB 1052 (1972));

*Crittenton Hosp.*, 343 NLRB 717, 746 (2004) ("Compelling an employee to attend

such an interview when his request for union representation has been denied violates Section 8(a)(1) of the Act."); *In re Chrysler Corp.*, 241 NLRB 1050, 1053 (1979) ("[A]n employer may not compel an employee to participate in a meeting or interview with management without the presence of his chosen representative where he reasonably fears that such meeting might result in action adverse to his interests. . . .").

Here, it is undisputed that the Hospital employees were not compelled to appear before the Committee. To the contrary, the Hospital offered the Nurses in writing "the opportunity to speak with the Nursing Peer Review Committee if you choose." (Joint Exhibits 4, 6, and 7.) Alternatively, each Nurse could "submit a written response to the Committee if you wish in lieu of an appearance." (*Id.*) Under these circumstances, the Hospital hardly committed the "serious violation of the individual's right to engage in concerted activity" that *Weingarten* cautions against by compelling employees to attend an investigatory interview.

In its Decision, however, the Board attempts to end-run the irrefutable language of the letters informing employees of their opportunity to attend the peer review meetings if they so chose by concluding that "the employees did not knowingly waive their right to a *Weingarten* representative" because the Hospital did not "give the employees the opportunity to cease their participation in the meetings" after allegedly denying their request for a Union representative.

-42-

Decision at 2, 3 n.11.  The NLRA, however, does not impose an affirmative

obligation on employers to expressly inform employees of their *Weingarten* rights,

even where such a right exists.  *U.S. Postal Service*, 241 NLRB 141, 151 (1979)

("the *Weingarten* class of cases implicitly hold that the employer is under no

obligation affirmatively to advise the employee of his *Weingarten* rights.").  And

here, the Committee clearly and unequivocally informed the employees *before* the

meeting that attendance was voluntary and that they could, instead, submit a

written statement.

     The Board, nonetheless, cites *Postal Service* for the following proposition:

> Under no circumstances may the employer continue the
> interview without granting the employee union
> representation, *unless* the employee voluntarily agrees to
> remain unrepresented *after* having been presented by the
> employer with the choices mentioned in option (3) above
> or if the employee is otherwise aware of those choices.

Decision at 2 (citing *U.S. Postal Service*, 241 NLRB at 141) (emphasis in original).

The *Postal Service* decision is clearly distinguishable.  Unlike the Hospital, the

Postal Service compelled the employee's attendance at the interview.  In that case,

the employee, a security officer was summoned to a lieutenant's office as part of

an investigation into an alleged criminal conspiracy to defraud the federal

government.  Given that the employee's initial reaction to the interview was to ask,

"Am I under arrest?", his participation was hardly voluntary.  *Id*. at 144.  Thus,

under those circumstances, the employer was required to "offer the employee the

choice between continuing the interview unaccompanied by a union representative or having no interview at all." *Id*. at 141. Here, in contrast, there is no dispute that the employees at issue knew that participation was voluntary, as explicitly set forth in the letters that each received before they chose to attend the meeting.[6] *See also Mountain View Hosp., Inc.*, 356 NLRB No. 177, slip op. at *36 (2011) ("Accordingly, as [the supervisor] gave [the employee] the option of having the meeting or not, there is no Weingarten violation.").

Even assuming *arguendo* that the Hospital was required to inform the Nurses of their option to (a) have no interview or (b) continue the interview unaccompanied by a union representative, as the Board's Decision would require, the Hospital satisfied its obligation. Indeed, given that the Hospital already had informed the employees, in the letters notifying them of the Committee meetings, that their attendance at the Peer Review Committee meeting was not required, the Hospital satisfied any obligation to inform the employees of their option to have no interview. Nothing in the law requires the Hospital to inform the Nurses of this

---

[6] Aside from *Weingarten* itself and *Postal Service*, the Board cited only one additional case, *El Paso Electric Co.*, 355 NLRB 428 (2010), for the proposition that the Hospital was obligated to inform the Nurses of their *Weingarten* rights during a voluntary investigatory interview. In *El Paso* a supervisor "told [the employee] to report for a disciplinary meeting at 3 p.m." 355 NLRB at 441. Given that the investigation in *El Paso Electric* was compulsory, the case is distinguishable on the same basis as *Postal Service*.

option multiple times.[7]  In sum, the Board's holding that the Hospital violated the Act by denying Nurses a *Weingarten* representative where Menorah already had informed employees that their attendance was voluntary misapplies its own precedent, is based on findings not supported by substantial evidence, and must be reversed.  *Jochims*, 480 F.3d  at 1167.

> **(2)    The Board Erroneously Held That The Nurses Reasonably Expected That their Appearance Before the Peer Review Committee Could Result In Discipline.**

Under *Weingarten*, employees have a right to a union representative only at an interview which an employee reasonably believes may result in discipline.  The standard is an objective one.  *Weingarten*, 420 U.S. at 257 n.5.  Thus, even an employee's mistaken belief that a meeting could result in discipline does not entitle the employee to a union representative.  *NLRB. v. U.S. Postal Serv.*, 689 F.2d 835, 838 (9th Cir. 1982).

In *NLRB v. U.S. Postal Service*, a supervisor rejected an employee's request for a union representative for a meeting to discuss alleged violations of the employer's overtime policy by stating, "No, you don't [need a representative]. This is just a discussion."  689 F.2d at 837.  The Ninth Circuit overturned the Board's

---

[7] Indeed, the Board found *Weingarten* violations with respect to both Nurses, despite the facts found by the ALJ that  Nurse Centye decided to appear for the voluntary  meeting after her request for representation had been denied by the Hospital. As a result, the Board's finding of *Weingarten* violations is not dependent on the timing of an employee's request and an employer's denial.

-45-

holding that the employer violated the employee's *Weingarten* rights on the basis

of the following language in the collective bargaining agreement:

> For minor offenses by an employee, management has a
> responsibility to discuss such matters with the employee.
> Discussions of this type shall be held in private between
> the employee and the supervisor. Such discussions are
> not considered discipline and are not grievable.

*Id*.  Because the employer informed the employee that the meeting was merely a

"discussion," which contractually could not result in discipline, the employee had

no right to a *Weingarten* representative.

The meeting in *Postal Service* is analogous to the meetings at issue here.

The Hospital requested Nurses' attendance at meetings that cannot result in

discipline by the Hospital and, therefore, are not grievable.  Given that state law

limits the Committee's duties to reporting certain incidents to the Nursing Board,

the peer review officers do not – and indeed cannot – issue discipline.  Thus, to the

extent the Nurses here believed that their attendance at the Committee meetings

may have led to discipline by the Hospital, such belief could not have been

reasonable.  The Nurses, therefore, had no right to union representation before the

Committee.

In any event, the Nurses at issue here actually knew that the meetings'

purpose was for the Committee to investigate matters on behalf of the Nursing

Board.  (Tr. 48:9-12; 51:6-8; 52:21-23; 54:5-17; Menorah Exhibits 1, 2 (Centye);

Tr. 103:22-105:3 (Smith).)  *See Postal Service*, 689 F.2d at 838 (no *Weingarten*

rights where employee was also aware of  collective bargaining agreement's

"discussion clause").  Their admissions are not unusual; all Nurses in Kansas are

required as a condition of licensure to be familiar with peer review.  Kan. Admin.

Regs. § 60-3-109a. [8]  The Board's holding that the Nurses had a reasonable belief

that their attendance at Committee meetings could result in discipline is not

supported by substantial evidence and must be reversed.

　　　The Board, apparently conceding that the Peer Review Committee does not

issue discipline, concluded that, if the Nursing Board, after conducting its own

investigation, decides to limit, suspend, or revoke a nurse's license, then the

Hospital "would have to suspend or discharge a nurse who lost her license."

Decision at 2.  The Board's reasoning stretches *Weingarten* rights to absurd

lengths.  This rationale would grant to employees a right to union representation in

any proceeding that ultimately, at some future date, could lead an employer to

terminate an employee.  Delivery drivers, for instance, would have union

representation during department of motor vehicles proceedings that could result in

suspension or revocation of a driver's license, while unionized attorneys would

have *Weingarten* rights at state bar proceedings.  Clearly, this was not the Supreme

---

[8] Given this, Nurses licensed in Kansas would reasonably understand that the
reference to "discipline" in the letters related to the peer review meetings means
discipline to be imposed by the Nursing Board.  Indeed, Nurse Smith admitted that
this was her understanding.  (Tr. 104:17-105:3.)

Court's intention when it held that Leura Collins had a right to a union representative for the investigatory interview to determine whether she had complied with her employer's employee lunch policy.

In any event, the Board was wrong when it declared outright that the Hospital would "have to suspend or discharge a nurse who lost her license." Decision at 2.  Kansas law permits unlicensed persons to deliver "auxiliary patient care services performed in medical care facilities . . . under the . . . the supervision of a registered professional nurse or a licensed practical nurse."  Kan. Stat. Ann. § 65-1124(h).  Thus, regardless of any eventual action that the Nursing Board may take after conducting its own investigation, it is not a foregone conclusion that the Hospital would be required to terminate or suspend a Nurse's employment.

### C.    The Board Erred By Failing to Hold that the Presence of a Union Representative Would Interfere with Legitimate Employer Prerogatives.

The Supreme Court was clear that "exercise of the right may not interfere with legitimate employer prerogatives." *Weingarten*, 420 U.S. at 258.  Indeed, the NLRB was not

> commissioned to effectuate the policies of the [National] Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this

-48-

> accommodation without excessive emphasis upon its
> immediate task.

*Southern S.S. Co. v. NLRB*, 316 U.S. 31, 47 (1942). In the Board's Decision

below, the NLRB shirked its responsibility to consider the employer's legitimate

needs as set forth in Kansas's peer review laws and made no effort to

accommodate that statutory scheme to the NLRA's right to union representation

under *Weingarten*.

Kansas law establishes that the "reports, statements, memoranda,

proceedings, findings and other records submitted to or generated by peer review

committees or officers shall be privileged." Kan. Stat. Ann. § 65-4915(b). State

law also provides that the privilege is waived if its holder "has . . . made disclosure

of any part of the matter or consented to such a disclosure by anyone." *Id*. at § 60-

437. Even under the Board's narrow (and erroneous) construction of Kansas law,

*see infra* at 52, the presence of a union representative could waive this privilege.

The Board's failure even to consider the impact of its holding on the Kansas

statutory peer review framework merits the Decision's reversal. *Southern S.S. Co.*,

316 U.S. at 47.

### III. THE BOARD ERRONEOUSLY HELD THAT THE HOSPITAL UNLAWFULLY FAILED TO PROVIDE INFORMATION

#### A. The Information Requested by the Union Is Not Relevant To the Union's Representational Duties

The Board erroneously held that information about peer review is relevant to

-49-

the Union's ability to monitor and enforce the collective bargaining agreement,

including to determine whether to file grievances on behalf of "unit employees

who might have unknowingly been the victims of discriminatory investigations

and discipline."  Decision at 3.  Although employers generally are required to

provide information that would assist the union in the performance of its duties as

the bargaining representative, *see Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303

(1979); *NLRB v. ACME Indus. Co.*, 385 U.S. 432, 435 (1967), an employer's duty

to provide information is not unlimited.  Information that is not pertinent to a

union's function as the collective bargaining representative is not presumptively

relevant, and the requesting union bears the burden to "to demonstrate the

relevance of [the requested] information."  *U.S. Testing Co. v. NLRB*, 160 F.3d 14,

19 (D.C. Cir. 1998); *see also Shoppers Food Warehouse*, 315 NLRB 258, 259

(1994) (union must "demonstrate[] a reasonable belief supported by objective

evidence").

　　　　Here, the Union cannot meet this burden because information about peer

review proceedings is not relevant to the Union's representational duties.  The

Committee's officers merely execute their duties as state officers to report certain

incidents to the Nursing Board.  They do not issue discipline.  As a result, the Peer

Review Committee does not take any action that relates to the collective

bargaining agreement, such as its grievance procedure.  "Peer review does not

directly implicate the [Hospital's] disciplinary process nor either party's

obligations under the collective-bargaining agreement."  Decision at 10 (Member

Johnson, dissenting).  Thus, information about peer review is irrelevant and need

not be produced.  *See Parsons Elec. Co. v. NLRB*, 976 F.2d 1167, 1169-70 (8th

Cir. 1992) ("With respect to matters for which the union would have no authority

to bring a grievance, however, an information request cannot be enforced because

the information requested is not relevant to the union's duties."); *S. Cal. Gas Co.*,

342 NLRB 613, 614-515 (2004) (no obligation to produce information to support

union's claim with public utilities agency because the "the information sought . . .

was for a matter before a state agency").

### B.    The Board Misconstrued Kansas Law In Holding That The Requested Information Was Not Confidential.

Given that none of the information at issue is relevant, the Board erred by

holding that the Hospital violated the Act by failing to produce it.  But, even if the

information were relevant, the Hospital's confidentiality interest, under the state

law privilege, justified the Hospital's refusal to produce it.

A union's presumptive right to relevant information does not predominate

over other interests in all cases, including when an employer asserts a legitimate

and substantial interest in maintaining confidentiality.  *See Detroit Edison*, 440

U.S. at 317.  If an employer shows that it has a legitimate confidentiality interest,

its obligation is not to produce the confidential information but to bargain toward

-51-

an accommodation that balances the union's informational needs and the employer's confidentiality interests.  *Penn. Power Co.*, 301 NLRB 1104, 1105-06 (1991).  The Board erred by holding that the Hospital "failed to establish a legitimate and substantial confidential interest in any of the requested information. . . .".  Decision at 4.

The Kansas statutory peer review privilege protects from "discovery, subpoena or other means of legal compulsion" the "the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers. . . .".  Kan. Stat. Ann. § 65-4915(b).  The Board's Decision recognized that, if information is privileged under state law, it is also confidential under the NLRA.  Decision at 4 (citing *Kaleida Health, Inc.*, 356 NLRB No. 171 (2011).  Relying on a federal district court opinion, *Hill v. Sandhu*, 129 F.R.D. 548 (D. Kan. 1990), however, the Board disregarded the plain and clear language of Section 65-4915(b) and concluded that the peer review privilege only protects the "deliberations and the documents created by the committee."  Decision at 4 (citing *Sandhu*, 129 F.R.D. at 550).  In doing so, the Board committed reversible error by relying on a previous version of the statutory privilege that the legislature subsequently amended and significantly expanded.

At the time of *Sandhu*, Section 65-4915(b) read: "the reports, statements, memorandums, proceedings, findings, **and other records of** peer review

committees or officers shall be privileged . . . . " Kan. Stat. Ann. § 65-4915(b) (1988) (emphasis added). Thus, the district court reasoned that the peer review privilege that was in effect at the time of the court's opinion did not apply to "reports reviewed *by* the committee" or "records and papers *submitted to* the peer review committee." *Sandhu*, 129 F.R.D. at 550, 551 (first emphasis in original).

Subsequently, the Kansas legislature revised – and significantly expanded – the scope of Section 65-4915(b) in 1997 to cover the types of documents that the *Sandhu* court ruled were not protected by the 1988 statute. 1997 Kan. Sess. Laws 149. From the 1997 amendments and through the version in effect today, Section 65-4915(b) states in relevant part: "the reports, statements, memoranda, proceedings, findings and **other records submitted to or generated by** peer review committees or officers shall be privileged." In the instant case, the Union requested information about the Committee's "proceedings" and documents "submitted to or generated by" the peer review committee or officers.[9] Such information is privileged and confidential under Kansas law.

Although Member Johnson, in his dissent, recognized that the peer review privilege was expanded in 1997, the Board majority failed to even consider impact of the amended statute. Decision at 8. Instead, the Board majority relied on

_____

[9] The Union sought, for instance, "[c]opies of any/all disciplines issued to any nurses who have appeared before the [Committee] . . ." and "[a]ll information regarding the nature of the allegations against all nurses so summoned [to the Committee]," among other information. Decision at 3.

statutory language that is no longer in effect to conclude that the state law privilege did not protect the information at issue.  In sum, the Board committed reversible error by misconstruing Kansas law to reach its conclusion that the documents at issue are not confidential under the NLRA.[10]

## C.    The Hospital Satisfied Its Obligation to Engage In Accommodative Bargaining.

Given that the Board found that the information about peer review meetings was not confidential, it did not reach the issue of whether the Hospital satisfied its obligation to bargain with the Union in an effort to reach an accommodation.  The Hospital certainly satisfied its obligation.  On multiple occasions, including in person, via telephone, via e-mail, and in written letters, the Hospital raised its confidentiality concerns and provided the Union with more than a sufficient amount of information related to its risk management plan and peer review process, including the Risk Management Plan itself, in an effort to accommodate

---

[10] The only other case that the Board cited in support of its narrow reading of Section 65-4915(b) is *Adams v. St. Francis Reg'l Med. Ctr.*, 955 P.2d 1169 (Kan. 1998).  The Kansas Supreme Court in *Adams,* however, noted that the issue in *Sandhu* was whether documents "prepared outside the hospital or independently from the disciplinary process" were privileged.  *Id*. at 1182.  Thus, relying in part on *Sandhu*, the *Adams* court held that documents created by the committee were privileged.  *Id*.  Although the Court in *Adams* ordered production of other documents that a hospital argued were privileged, these other documents were neither submitted to nor generated by the committee, but rather were created by the Nursing Board itself as part of its subsequent and independent investigation into a reportable incident.  *Id*. at 1183.  Given the different context of *Adams*, the case is inapposite to the requests at issue here.

-54-

the Union's request for privileged and confidential information.   By doing so, the Hospital complied fully with its obligation to bargain an accommodation over the Union's requests.  *See N. Ind. Pub. Serv. Co.*, 347 NLRB 210, 211 (2006) (employer lawfully responded to the union's request by providing the union with the requested information regarding an investigation, except for notes from confidential interviews).

### IV.   THE BOARD ERRONEOUSLY HELD THAT THE RISK MANAGEMENT PLAN'S CONFIDENTIALITY RULE IS OVERBROAD

As approved by the State of Kansas, the Hospital's Risk Management Plan restricts employees' ability to "disclose information concerning reportable incidents except to their superiors, Hospital Administration, the Risk Manager, the appropriate Hospital and Medical Staff committees, legal counsel for the Hospital, or the applicable licensing agencies" without prior approval from the "Risk Manager, Administration, or legal counsel."  The Board held that this rule unlawfully interferes with employees' Section 7 right to discuss terms and conditions of employment because the provision prohibits employees from discussing "what transpires at their committee meetings" and "the events underlying the peer review investigations."  The Board further found that the Hospital has not established "any legitimate basis for prohibiting discussion of these matters."  Decision at 1 n.3.  The Board erred on both counts.

### A.    The Rule Does Not Unlawfully Interfere With NLRA Protected Activity.

An employer's work rule may violate the Act if "employees would reasonably construe the language to prohibit Section 7 activity." *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2004).  In assessing such a claim, the provision at issue must be given a "reasonable reading."  *Id*. at 646.  The Board "must refrain from reading particular phrases in isolation, and it must not presume improper interference with employee rights."  *Id.*

Against these standards, the confidentiality provision at issue is lawful.  The Board's finding is based exclusively on one phrase, contained on page 16 of the 17-page Plan.  But, "reading particular phrases in isolation" and "parsing the language of the rule" is exactly what the Board has long-counseled against. *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998) (the charging party may not "pars[e] the language of the rule" or view phrases of a policy in isolation in hopes of extracting a violation), *enforced* 203 F.3d 52 (D.C. Cir. 1999).When read in context, the relevant employees, all of whom are Nurses licensed by the State of Kansas, would reasonably understand that the confidentiality provision was designed to prevent waiver of the privilege established by Kansas peer review law.

On its face, the provision only applies to information "concerning *reportable incidents*" and does not prohibit employees from discussing terms or conditions of employment with their coworkers.  The term "reportable incidents" refers only to

-56-

incidents that are reported by the Committee to the Nursing Board. As discussed *supra* at 45, Nurses in Kansas are fully aware of the meaning and implications of the term "reportable incident." (*See* Tr. 48:9-12; 51:6-8; 52:21-23; 54:5-17; Menorah Exhibits 1-2; Kan. Admin. Regs. § 60-3-109a.) Thus, a reasonable nurse licensed to practice by the State of Kansas should and would understand that the Plan's confidentiality provision refers to maintaining the confidentiality and privilege of information "submitted to or generated by peer review committees or officers." Kan. State. Ann. § 65-4915(b). The Board's conclusion that Nurses view the phrase at issue as prohibiting employees from discussing terms and conditions of employment is contrary to the Board's established standards. *See Flamingo Hilton-Laughlin*, 330 NLRB 287, 294 (1999) (upholding hotel's work rule requiring positive attitude where "[t]here can be no doubt that an employer in the service industry may require that employees maintain a satisfactory attitude").

Moreover, as this Court has recognized, employees do not reasonably construe work rules as prohibiting Section 7 activity where the rule is promulgated to further an employer's compliance with other laws and regulations. In *Adtranz*, the Court vacated a Board decision that found that an employer's rule prohibiting "abusive or threatening language to anyone on company premises" chilled NLRB-protected activity where the rule was intended to maintain workplace civility and prevent liability for harassment. 253 F.3d at 25-28. The Court took the Board to

task for failing to recognize the importance of employer compliance with laws

other than the NLRA:

> We cannot help but note that the NLRB is remarkably
> indifferent to the concerns and sensitivity which prompt
> many employers to adopt the sort of rule at issue here.
> Under both federal and state law, employers are subject
> to civil liability should they fail to maintain a workplace
> free of racial, sexual, and other harassment. Abusive
> language can constitute verbal harassment triggering
> liability under state or federal law.

*Id*. at 27.

As in *Adtranz*, the confidentiality rule at issue in the Plan was required by

the State of Kansas in order for the Hospital to comply with its obligations under

the Kansas nurse licensure scheme.  Indeed, the rule is necessary for the Hospital

to maintain its own license under Kansas law.  Given that the rule at issue here was

promulgated in response to and is necessary in order to maintain the state law

privilege and the Hospital's own license, employees would not reasonably construe

the rule to prohibit NLRA-protected activity.

## B.     The Confidentiality Rule Is Supported By Legitimate Business Justifications.

Even if the confidentiality rule reasonably could be read to prohibit

protected activity, the Hospital's significant business justification outweighs any

interference with employees' rights under the NLRA.  The Board dismissed in one

sentence in a footnote the notion that Menorah established a "legitimate basis for

prohibiting discussion of these matters," Decision at 1 n.3, leaving the Hospital

and this Court to surmise the NLRB's rationale.

To the extent the Board's finding is based on its interpretation of the

privilege established by Section 65-4915(b), the Board's reasoning is flawed

because the Board misconstrued Kansas law by relyingon an outdated version of

the statute. Given that the 1997 amendment significantly expanded the privilege,

state law establishes the Hospital's strong business justification in maintaining the

confidentiality of information that is submitted to or generated by the Committee.

(Joint Exhibit 2 at 17.)

In sum, the confidentiality rule does not prohibit employees from discussing

terms and conditions of employment, and even if it did, the Hospital's strong

business justification outweighs any infringement of employees' rights.

**V.     THE BOARD ERRED BY AFFIRMING THE ALJ'S
ADMISSION OF TESTIMONY ON PRIVILEGED MATTERS
AND BY AFFIRMING THE ALJ'S RESCISSION OF THE
PROTECTIVE ORDER.**

The ALJ admitted, over the Hospital's objection, certain testimony on

matters subject to the statutory peer review privilege. The ALJ also rescinded the

protective order she had previously issued regarding the testimony on privileged

subjects. The Board erred by affirming these rulings.

According to the Board, no witnesses testified to privileged matters because

"the testimony at issue concerned the employees' appearances before the

Committee, and no witness testified about the Committee's deliberations or decision-making process."  Decision at 1 n.2 (citing *Sandhu*, 129 F.R.D. at 550). Like the Board's ruling on the Union's information requests, the NLRB's conclusions here rests on a federal district court's interpretation of a prior and narrower version of the peer review privilege that the legislature subsequently expanded.  Reviewing the current and applicable statutes, testimony that "concerned the employees' appearances before the Committee" is clearly privileged.  As a result, the Board's holdings on the protective order and on the Hospital's objections to admitting privileged testimony are erroneous.

## CONCLUSION

For the reasons outlined above, the Hospital respectfully requests that this Court vacate the Board's order.

//

//

//

//

//

//

//

//

Dated: December 22, 2015

Respectfully submitted,

/s/ Noel J. Francisco

Noel J. Francisco
njfrancisco@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-5485

-and-

F. Curt Kirschner, Jr.
ckirschner@jonesday.com
Jonathan S. Sack
jsack@jonesday.com
JONES DAY
555 California St., 26th Floor
San Francisco, CA 94104
Telephone:  (415) 626-3939

*Counsel for Petitioner*
*Menorah Medical Center*

## STATUTORY ADDENDUM

## STATUTORY ADDENDUM TABLE OF CONTENTS

| Statute | Page |
|---|---|
| 29 U.S.C. § 151 | A-1 |
| 29 U.S.C. § 152 | A-2 |
| 29 U.S.C. § 157 | A-2 |
| 29 U.S.C. § 160 | A-2 |
| Kan. Stat. Ann. § 60-437 | A-3 |
| Kan. Stat. Ann. § 65-1115 | A-3 |
| Kan. Stat. Ann. § 65-1120 | A-4 |
| Kan. Stat. Ann. § 65-1123 | A-7 |
| Kan. Stat. Ann. § 65-1124 | A-7 |
| Kan. Stat. Ann. § 65-1135 | A-7 |
| Kan. Stat. Ann. § 65-4915 | A-8 |
| Kan. Stat. Ann. § 65-4922 | A-9 |
| Kan. Stat. Ann. § 65-4923 | A-10 |
| Kan. Stat. Ann. § 65-4927 | A-11 |
| Kan. Stat. Ann. § 65-4929 | A-11 |
| Kan. Stat. Ann. § 74-1106 | A-12 |
| Kan. Stat. Ann. § 74-1110 | A-15 |
| Kan. Admin. Regs. § 28-52-1 | A-15 |
| Kan. Admin. Regs. § 28-52-4 | A-17 |
| Kan. Admin. Regs. § 60-3-109a | A-18 |
| Kan. Admin. Regs. § 60-3-110 | A-18 |

**29 U.S.C. § 151.  Findings and declaration of policy.**

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice

and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

## 29 U.S.C. § 152.  Definitions.

When used in this subchapter--

 . . .

**(2)** The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

 . . .

## 29 U.S.C. § 157.  Right of employees as to organization, collective bargaining, etc.

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

## 29 U.S.C. § 160.  Prevention of unfair labor practices.

 . . .

 **(f)** Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by

filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

. . .

## Kan. Stat. Ann. § 60-437.  Waiver of privilege by contract or previous disclosure.

A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has (a) contracted with a party against whom the privilege is claimed that he or she would not claim the privilege or, (b) without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone.

## Kan. Stat. Ann. § 65-1115.  Licensure of professional nurses; qualifications of applicants; examination; refresher course; renewal license; title and abbreviation; temporary permit; exempt license.

 **(a)** *Qualifications of applicants.* An applicant for a license to practice as a registered professional nurse shall:

 **(1)** Have graduated from an approved school of professional nursing in the United States or its territories or from a school of professional nursing in a foreign country which is approved by the board as defined in rules and regulations;

 **(2)** have obtained other qualifications not in conflict with this act as the board may prescribe by rule and regulation; and

A-3

(3) file with the board written application for a license.

**(b)** *Applicant deficient in qualifications.* If the board finds in evaluating any applicant that such applicant is deficient in qualification or in the quality of such applicant's educational experience, the board may require such applicant to fulfill such remedial or other requirements as the board may prescribe.

**(c)** *License.*

**(1)** The board shall issue a license to an applicant to practice as a registered professional nurse who has:

**(A)** Met the qualifications set forth in subsections (a) and (b);

**(B)** passed a written examination as prescribed by the board; and

**(C)** no disqualifying factors under K.S.A. 65-1120, and amendments thereto.

. . .

**Kan. Stat. Ann. § 65-1120.  Grounds for disciplinary actions; proceedings; witnesses; costs; professional incompetency defined; criminal justice record information.**

**(a)** *Grounds for disciplinary actions.* The board may deny, revoke, limit or suspend any license or authorization to practice nursing as a registered professional nurse, as a licensed practical nurse, as an advanced practice registered nurse or as a registered nurse anesthetist that is issued by the board or applied for under this act or may publicly or privately censure a licensee or holder of a temporary permit or authorization, if the applicant, licensee or holder of a temporary permit or authorization is found after hearing:

**(1)** To be guilty of fraud or deceit in practicing nursing or in procuring or attempting to procure a license to practice nursing;

**(2)** to have been guilty of a felony or to have been guilty of a misdemeanor involving an illegal drug offense unless the applicant or licensee establishes sufficient rehabilitation to warrant the public trust, except that notwithstanding K.S.A. 74-120, and amendments thereto, no license or authorization to practice nursing as a licensed professional nurse, as a licensed practical nurse, as an advanced practice registered nurse or registered nurse anesthetist shall be granted to a person with a felony conviction for a crime against persons as specified in article 34 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or

A-4

article 54 of chapter 21 of the Kansas Statutes annotated, or K.S.A. 21-6104, 21-6325, 21-6326 or 21-6418, and amendments thereto;

**(3)** to have committed an act of professional incompetency as defined in subsection (e);

**(4)** to be unable to practice with skill and safety due to current abuse of drugs or alcohol;

**(5)** to be a person who has been adjudged in need of a guardian or conservator, or both, under the act for obtaining a guardian or conservator, or both, and who has not been restored to capacity under that act;

**(6)** to be guilty of unprofessional conduct as defined by rules and regulations of the board;

**(7)** to have willfully or repeatedly violated the provisions of the Kansas nurse practice act or any rules and regulations adopted pursuant to that act, including K.S.A. 65-1114 and 65-1122, and amendments thereto;

**(8)** to have a license to practice nursing as a registered nurse or as a practical nurse denied, revoked, limited or suspended, or to be publicly or privately censured, by a licensing authority of another state, agency of the United States government, territory of the United States or country or to have other disciplinary action taken against the applicant or licensee by a licensing authority of another state, agency of the United States government, territory of the United States or country. A certified copy of the record or order of public or private censure, denial, suspension, limitation, revocation or other disciplinary action of the licensing authority of another state, agency of the United States government, territory of the United States or country shall constitute prima facie evidence of such a fact for purposes of this paragraph (8); or

**(9)** to have assisted suicide in violation of K.S.A. 21-3406, prior to its repeal, or K.S.A. 21-5407, and amendments thereto, as established by any of the following:

  **(A)** A copy of the record of criminal conviction or plea of guilty for a felony in violation of K.S.A. 21-3406, prior to its repeal, or K.S.A. 21-5407, and amendments thereto.

  **(B)** A copy of the record of a judgment of contempt of court for violating an injunction issued under K.S.A. 60-4404, and amendments thereto.

(**C**) A copy of the record of a judgment assessing damages under K.S.A. 60-4405, and amendments thereto.

(**b**) *Proceedings.* Upon filing of a sworn complaint with the board charging a person with having been guilty of any of the unlawful practices specified in subsection (a), two or more members of the board shall investigate the charges, or the board may designate and authorize an employee or employees of the board to conduct an investigation. After investigation, the board may institute charges. If an investigation, in the opinion of the board, reveals reasonable grounds for believing the applicant or licensee is guilty of the charges, the board shall fix a time and place for proceedings, which shall be conducted in accordance with the provisions of the Kansas administrative procedure act.

(**c**) *Witnesses.* No person shall be excused from testifying in any proceedings before the board under this act or in any civil proceedings under this act before a court of competent jurisdiction on the ground that such testimony may incriminate the person testifying, but such testimony shall not be used against the person for the prosecution of any crime under the laws of this state except the crime of perjury as defined in K.S.A. 21-5903, and amendments thereto.

(**d**) *Costs.* If final agency action of the board in a proceeding under this section is adverse to the applicant or licensee, the costs of the board's proceedings shall be charged to the applicant or licensee as in ordinary civil actions in the district court, but if the board is the unsuccessful party, the costs shall be paid by the board. Witness fees and costs may be taxed by the board according to the statutes relating to procedure in the district court. All costs accrued by the board, when it is the successful party, and which the attorney general certifies cannot be collected from the applicant or licensee shall be paid from the board of nursing fee fund. All moneys collected following board proceedings shall be credited in full to the board of nursing fee fund.

(**e**) *Professional incompetency defined.* As used in this section, "professional incompetency" means:

(**1**) One or more instances involving failure to adhere to the applicable standard of care to a degree which constitutes gross negligence, as determined by the board;

(**2**) repeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the board; or

**(3)** a pattern of practice or other behavior which demonstrates a manifest incapacity or incompetence to practice nursing.

**(f)** *Criminal justice information.* The board upon request shall receive from the Kansas bureau of investigation such criminal history record information relating to arrests and criminal convictions as necessary for the purpose of determining initial and continuing qualifications of licensees of and applicants for licensure by the board.

## Kan. Stat. Ann. § 65-1123.  Injunctions.

When it appears to the board that any person is violating any of the provisions of this act or that any person, firm, corporation, institution or association is employing (except as permitted under K.S.A. 65-1124 and amendments thereto) a person to perform professional nursing or practical nursing in Kansas, who is not licensed under this act, the board may in its own name bring an action in a court of competent jurisdiction for an injunction against such violation or such employing, and the proper courts of this state may enjoin any person, firm or corporation, institution or association from violation of this act or such employing without regard to whether proceedings have been or may be instituted before the board or whether criminal proceedings have been or may be instituted.

## Kan. Stat. Ann. § 65-1124.  Acts which are not prohibited.

No provisions of this law shall be construed as prohibiting:

. . .

**(h)** auxiliary patient care services performed in medical care facilities, adult care homes or elsewhere by persons under the direction of a person licensed to practice medicine and surgery or a person licensed to practice dentistry or the supervision of a registered professional nurse or a licensed practical nurse;

. . .

## Kan. Stat. Ann. § 65-1135.  Complaint or information relating to complaint confidential; exceptions.

**(a)** Any complaint or report, record or other information relating to the investigation of a complaint about a person licensed by the board which is received, obtained or maintained by the board is confidential and shall not be disclosed by the board or its employees in a manner which identified or enables

identification of the person who is the subject or source of such information except:

> **(1)** In a disciplinary proceeding conducted by the board pursuant to law or in an appeal of the order of the board entered in such proceeding, or to any party to such proceeding or appeal or such party's attorney;

. . .

**Kan. Stat. Ann. § 65-4915.  Peer review; health care providers, services and costs; definitions; authority of peer review officer or committee; records and testimony of information contained therein privileged; licensing agency disciplinary proceedings; exceptions.**

**(a)** As used in this section:

> . . .

> **(4)** "Peer review officer or committee" means:

> > **(A)** An individual employed, designated or appointed by, or a committee of or employed, designated or appointed by, a health care provider group and authorized to perform peer review; or

> > **(B)** a health care provider monitoring the delivery of health care at correctional institutions under the jurisdiction of the secretary of corrections.

**(b)** Except as provided by K.S.A. 60-437, and amendments thereto, and by subsections (c) and (d), the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity or be admissible in evidence in any judicial or administrative proceeding. Information contained in such records shall not be discoverable or admissible at trial in the form of testimony by an individual who participated in the peer review process. The peer review officer or committee creating or initially receiving the record is the holder of the privilege established by this section. This privilege may be claimed by the legal entity creating the peer review committee or officer, or by the commissioner of insurance for any records or proceedings of the board of governors.

. . .

A-8

**Kan. Stat. Ann. § 65-4922.  Medical care facilities; risk management program required; submission of plan; inspections and investigations; approval of plan; reports and records confidential.**

**(a)** Each medical care facility shall establish and maintain an internal risk management program which shall consist of:

> **(1)** A system for investigation and analysis of the frequency and causes of reportable incidents within the facility;

> **(2)** measures to minimize the occurrence of reportable incidents and the resulting injuries within the facility; and

> **(3)** a reporting system based upon the duty of all health care providers staffing the facility and all agents and employees of the facility directly involved in the delivery of health care services to report reportable incidents to the chief of the medical staff, chief administrative officer or risk manager of the facility.

**(b)** Not less than 60 days before the time for renewal of its license in 1987, each medical care facility shall submit to the department its plan for establishing and implementing an internal risk management program. Such plan may rely upon policies and procedures adopted by the medical care facility and its departments and committees. Failure to submit such a plan shall result in denial of the renewal of the facility's license.

**(c)** The department shall make or cause to be made such inspections and investigations as it deems necessary to reasonably assure that each medical care facility is implementing the internal risk management program required by this section. In making such inspections and investigations, the department may review and copy the reports and records of all executive committees designated to investigate reportable incidents under this act.

**(d)** Upon review of a plan submitted pursuant to subsection (b), the department shall determine whether the plan meets criteria of this section. If the plan does not meet such criteria, the department shall disapprove the plan and return it to the facility, along with the reasons for disapproval. Within 60 days, the facility shall submit to the department a revised plan which meets the requirements of this section and any rules and regulations adopted hereunder. No medical care facility shall be granted renewal of its license in 1988 unless its plan has been approved by the department.

**(e)** A medical care facility shall not be liable for compliance with or failure to

comply with the provisions of this section or any rules and regulations adopted hereunder, except as provided in K.S.A. 65-430 and amendments thereto.

**(f)** The secretary shall adopt such rules and regulations as necessary to administer and enforce the provisions of this section.

**(g)** Any reports and records reviewed or obtained by the department and in the department's possession, pursuant to subsection (a) of K.S.A. 65-4925, and amendments thereto, shall be confidential and privileged and not subject to discovery, subpoena or legal compulsion for their release to any person or entity, nor shall they be admissible in any civil or administrative action other than a disciplinary proceeding by the department.

## Kan. Stat. Ann. § 65-4923.  Reporting requirements.

**(a)** If a health care provider, or a medical care facility agent or employee who is directly involved in the delivery of health care services, has knowledge that a health care provider has committed a reportable incident, such health care provider, agent or employee shall report such knowledge as follows:

**(1)** If the reportable incident did not occur in a medical care facility, the report shall be made to the appropriate state or county professional society or organization, which shall refer the matter to a professional practices review committee duly constituted pursuant to the society's or organization's bylaws. The committee shall investigate all such reports and take appropriate action. The committee shall have the duty to report to the appropriate state licensing agency any finding by the committee that a health care provider acted below the applicable standard of care which action had a reasonable probability of causing injury to a patient, or in a manner which may be grounds for disciplinary action by the appropriate licensing agency, so that the agency may take appropriate disciplinary measures.

**(2)** If the reportable incident occurred within a medical care facility, the report shall be made to the chief of the medical staff, chief administrative officer or risk manager of the facility. The chief of the medical staff, chief administrative officer or risk manager shall refer the report to the appropriate executive committee or professional practices peer review committee which is duly constituted pursuant to the bylaws of the facility. The committee shall investigate all such reports and take appropriate action, including recommendation of a restriction of privileges at the appropriate medical care facility. In making its investigation, the committee may also consider treatment rendered by the health

care provider outside the facility. The committee shall have the duty to report to the appropriate state licensing agency any finding by the committee that a health care provider acted below the applicable standard of care which action had a reasonable probability of causing injury to a patient, or in a manner which may be grounds for disciplinary action by the appropriate licensing agency, so that the agency may take appropriate disciplinary measures.

. . .

**Kan. Stat. Ann. § 65-4927.  Failure to report; remedies; immunity from civil liability.**

. . .

**(b)** The license of a person or entity required to report under subsection (a) of K.S.A. 65-4923 may be revoked, suspended or limited, or the licensee subjected to public or private censure, by the appropriate state licensing agency if the licensee is found, pursuant to the Kansas administrative procedure act, to have willfully and knowingly failed to make any report as required by K.S.A. 65-4923 or 65-4924.

. . .

**Kan. Stat. Ann. § 65-4929.  Purpose of risk management programs; status of entities conducting programs; antitrust immunity.**

**(a)** The legislature of the state of Kansas recognizes the importance and necessity of providing and regulating certain aspects of health care delivery in order to protect the public's general health, safety and welfare. Implementation of risk management plans and reporting systems as required by K.S.A. 65-4922, 65-4923 and 65-4924 and peer review pursuant to K.S.A. 65-4915 and amendments thereto effectuate this policy.

**(b)** Health care providers and review, executive or impaired provider committees performing their duties under K.S.A. 65-4922, 65-4923 and 65-4924 and peer review pursuant to K.S.A. 65-4915 and amendments thereto for the purposes expressed in subsection (a) and 65-4915 and amendments thereto shall be considered to be state officers engaged in a discretionary function and all immunity of the state shall be extended to such health care providers and committees, including that from the federal and state antitrust laws.

. . .

A-11

**Kan. Stat. Ann. § 74-1106.  Board of nursing; appointment; terms; vacancies; qualifications; duties and powers; executive administrator and other employees; rules and regulations; compensation and expenses.**

**(a)** *Appointment, term of office.*

**(1)** The governor shall appoint a board consisting of 11 members of which six shall be registered professional nurses, two shall be licensed practical nurses and three shall be members of the general public, which shall constitute a board of nursing, with the duties, power and authority set forth in this act.

**(2)** Upon the expiration of the term of any registered professional nurse, the Kansas state nurses association shall submit to the governor a list of registered professional nurses containing names of not less than three times the number of persons to be appointed, and appointments shall be made after consideration of such list for terms of four years and until a successor is appointed and qualified.

**(3)** On the effective date of this act, the Kansas federation of licensed practical nurses shall submit to the governor a list of licensed practical nurses containing names of not less than three times the number of persons to be appointed, and appointments shall be made after consideration of such list for a term of four years and until a successor is appointed and qualified.

**(4)** Each member of the general public shall be appointed for a term of four years and successors shall be appointed for a like term.

**(5)** Whenever a vacancy occurs on the board of nursing, it shall be filled by appointment for the remainder of the unexpired term in the same manner as the preceding appointment. No person shall serve more than two consecutive terms as a member of the board of nursing and appointment for the remainder of an unexpired term shall constitute a full term of service on such board.

**(b)** *Qualifications of members.* Each member of the board shall be a citizen of the United States and a resident of the state of Kansas. Registered professional nurse members shall possess a license to practice as a professional nurse in this state with at least five years' experience in nursing as such and shall be actively engaged in professional nursing in Kansas at the time of appointment and reappointment. The licensed practical nurse members shall be licensed to practice practical nursing in the state with at least five years' experience in practical nursing and shall be actively engaged in practical nursing in Kansas at the time of appointment and reappointment. The governor shall appoint successors so that the registered professional nurse membership of the board shall consist of at least two members

who are engaged in nursing service, at least two members who are engaged in nursing education and at least one member who is engaged in practice as an advanced practice registered nurse or a registered nurse anesthetist. The consumer members shall represent the interests of the general public. At least one consumer member shall not have been involved in providing health care. Each member of the board shall take and subscribe the oath prescribed by law for state officers, which oath shall be filed with the secretary of state.

**(c)** *Duties and powers.*

**(1)** The board shall meet annually at Topeka during the month of September and shall elect from its members a president, vice-president and secretary, each of whom shall hold their respective offices for one year. The board shall employ an executive administrator, who shall be a registered professional nurse, who shall not be a member of the board and who shall be in the unclassified service under the Kansas civil service act, and shall employ such other employees, who shall be in the classified service under the Kansas civil service act as necessary to carry on the work of the board. As necessary, the board shall be represented by an attorney appointed by the attorney general as provided by law, whose compensation shall be determined and paid by the board with the approval of the governor. The board may hold such other meetings during the year as may be deemed necessary to transact its business.

**(2)** The board shall adopt rules and regulations consistent with this act necessary to carry into effect the provisions thereof, and such rules and regulations may be published and copies thereof furnished to any person upon application.

**(3)** The board shall prescribe curricula and standards for professional and practical nursing programs and mental health technician programs, and provide for surveys of such schools and courses at such times as it may deem necessary. It shall accredit such schools and approve courses as meet the requirements of the appropriate act and rules and regulations of the board.

**(4)** The board shall examine, license and renew licenses of duly qualified applicants and conduct hearings upon charges for limitation, suspension or revocation of a license or approval of professional and practical nursing and mental health technician programs and may limit, deny, suspend or revoke for proper legal cause, licenses or approval of professional and practical nursing and mental health technician programs, as hereinafter provided. Examination for applicants for registration shall be given at least twice each year and as many other times as deemed necessary by the board. The board shall promote improved

A-13

means of nursing education and standards of nursing care through institutes, conferences and other means.

**(5)** The board shall have a seal of which the executive administrator shall be the custodian. The president and the secretary shall have the power and authority to administer oaths in transacting business of the board, and the secretary shall keep a record of all proceedings of the board and a register of professional and practical nurses and mental health technicians licensed and showing the certificates of registration or licenses granted or revoked, which register shall be open at all times to public inspection.

**(6)** The board may enter into contracts as may be necessary to carry out its duties.

**(7)** The board is hereby authorized to apply for and to accept grants and may accept donations, bequests or gifts. The board shall remit all moneys received by it under this paragraph (7) to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the grants and gifts fund which is hereby created. All expenditures from such fund shall be made in accordance with appropriation acts upon warrants of the director of accounts and reports issued pursuant to vouchers approved by the president of the board or a person designated by the president.

**(8)** A majority of the board of nursing including two professional nurse members shall constitute a quorum for the transaction of business.

**(d)** *Subpoenas.* In all investigations and proceedings, the board shall have the power to issue subpoenas and compel the attendance of witnesses and the production of all relevant and necessary papers, books, records, documentary evidence and materials. Any person failing or refusing to appear or testify regarding any matter about which such person may be lawfully questioned or to produce any books, papers, records, documentary evidence or relevant materials in the matter, after having been required by order of the board or by a subpoena of the board to do so, upon application by the board to any district judge in the state, may be ordered by such judge to comply therewith. Upon failure to comply with the order of the district judge, the court may compel obedience by attachment for contempt as in the case of disobedience of a similar order or subpoena issued by the court. A subpoena may be served upon any person named therein anywhere within the state with the same fees and mileage by an officer authorized to serve subpoenas in civil actions in the same procedure as is prescribed by the code of civil procedure for subpoenas issued out of the district courts of this state.

**(e)** *Compensation and expenses.* Members of the board of nursing attending meetings of such board, or attending a subcommittee meeting thereof authorized by such board, shall be paid compensation, subsistence allowances, mileage and other expenses as provided in K.S.A. 75-3223, and amendments thereto. No member of the board of nursing shall be paid an amount as provided in K.S.A. 75-3223, and amendments thereto, if such member receives an amount from another governmental or private entity for the purpose for which such amount is payable under K.S.A. 75-3223, and amendments thereto.

## Kan. Stat. Ann. § 74-1110.  Civil fine.

The board of nursing, in addition to any other penalty prescribed by law, may assess a civil fine, after proper notice and an opportunity to be heard, against any person granted a license, certificate of qualification or authorization to practice by the board of nursing for a violation of a law or rule and regulation applicable to the practice for which such person has been granted a license, certificate of qualification or authorization by the board in an amount not to exceed $1,000 for the first violation, $2,000 for the second violation and $3,000 for the third violation and for each subsequent violation. All fines assessed and collected under this section shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the state general fund.

## Kan. Admin. Regs. § 28-52-1. General requirements.

**(a)** Each medical care facility shall establish a written plan for risk management and patient care quality assessment on a facility-wide basis.

**(b)** The plan shall be approved and reviewed annually by the facility's governing body.

**(c)** Findings, conclusions, recommendations, actions taken, and results of actions taken shall be documented and reported through procedures established within the risk management plan.

**(d)** All patient services including those services provided by outside contractors or consultants shall be periodically reviewed and evaluated in accordance with the plan.

**(e)** Plan format. Each submitted plan shall include the following:

**(1)** Section I-a description of the system implemented by the facility for investigation and analysis of the frequency and causes of reportable incidents within the facility;

**(2)** Section II-a description of the measures used by the facility to minimize the occurrence of reportable incidents and the resulting injuries within the facility;

**(3)** Section III-a description of the facility's implementation of a reporting system based upon the duty of all health care providers staffing the facility and all agents and employees of the facility directly involved in the delivery of health care services to report reportable incidents to the chief of the medical staff, chief administrative officer, or risk manager of the facility;

**(4)** Section IV, organization-a description of the organizational elements of the plan including:

  **(A)** Name and address of the facility;

  **(B)** name and title of the facility's risk manager;

  **(C)** description of involvement and organizational structure of medical staff as related to risk management program, including names and titles of medical staff members involved in investigation and review of reportable incidents;

  **(D)** organizational chart indicating position of the facility's review committee as defined in K.S.A. 65-4923 and L. 1986, Ch. 229, New Section 4(a)(2); and

  **(E)** mechanism for ensuring quarterly reporting of incident reports to proper licensing agency.

**(5)** Section V-a description of the facility's resources allocated to implement the plan; and

**(6)** Section VI-documentation that the plan as submitted has been approved by the facility's governing body.

**(f)** Plan submittal. On and after November 1, 1986, each medical care facility shall submit the plan to the department at least 60 days prior to the license renewal date. After an initial plan is approved, any amendments to the plan shall be submitted to the department.

A-16

**(g)** Departmental review. Upon review of the facility's risk management plan or any amendments the department shall notify the facility in writing if the plan of amendments have been approved or disapproved. The written notification will specify the reason for disapproval.

**(h)** Revised plan. Within 60 days of the date the facility receives notification the plan has been disapproved, the facility shall submit a revised plan to the department.

**(i)** Plan publication. The plan shall be disseminated to personnel in accordance with the plan.

**Kan. Admin. Regs. § 28-52-4.  Standard-of-care determinations.**

**(a)** Each facility shall assure that analysis of patient care incidents complies with the definition of a "reportable incident" set forth at K.S.A. 65-4921. Each facility shall use categories to record its analysis of each incident, and those categories shall be in substantially the following form:

   **(1)** Standards of care met;

   **(2)** standards of care not met, but with no reasonable probability of causing injury;

   **(3)** standards of care not met, with injury occurring or reasonably probable; or

   **(4)** possible grounds for disciplinary action by the appropriate licensing agency.

**(b)** Each reported incident shall be assigned an appropriate standard-of-care determination under the jurisdiction of a designated risk management committee. Separate standard-of-care-determinations shall be made for each involved provider and each clinical issue reasonably presented by the facts. Any incident determined by the designated risk management committee to meet category (a)(3) or (a)(4) shall be considered a "reportable incident" and reported to the appropriate licensing agency in accordance with K.S.A. 65-4923.

**(c)** Each standard-of-care determination shall be dated and signed by an appropriately credentialed clinician authorized to review patient care incidents on behalf of the designated committee. In those cases in which documented primary review by individual clinicians or subordinate committees does not occur, standard-of-care determinations shall be documented in the minutes of the designated committee on a case-specific basis. Standard-of-care determinations

A-17

made by individual clinicians and subordinate committees shall be approved by the designated risk management committee on at least a statistical basis.

**Kan. Admin. Regs. § 60-3-109a.  Standards of practice.**

**(a)** Each registered professional nurse shall be familiar with the Kansas nurse practice act, the standards of practice of the profession and the code of ethics for professional nurses.

**(b)** Each licensed practical nurse shall be familiar with the Kansas nurse practice act, the standards of practice and the code of ethics for practical nurses.

**Kan. Admin. Regs. § 60-3-110.  Unprofessional conduct.**

Any of the following shall constitute "unprofessional conduct":

**(a)** Performing acts beyond the authorized scope of the level of nursing for which the individual is licensed

**(b)** assuming duties and responsibilities within the practice of nursing without making or obtaining adequate preparation or maintaining competency;

**(c)** failing to take appropriate action or to follow policies and procedures in the practice situation designed to safeguard each patient;

**(d)** inaccurately recording, falsifying, or altering any record of a patient or agency or of the board;

**(e)** physical abuse, which shall be defined as any act or failure to act performed intentionally or carelessly that causes or is likely to cause harm to a patient. This term may include any of the following:

   **(1)** The unreasonable use of any physical restraint, isolation, or medication that harms or is likely to harm a patient;

   **(2)** the unreasonable use of any physical or chemical restraint, medication, or isolation as punishment, for convenience, in conflict with a physician's order or a policy and procedure of the facility or a state statute or regulation, or as a substitute for treatment, unless the use of the restraint, medication, or isolation is in furtherance of the health and safety of the patient;

   **(3)** any threat, menacing conduct, or other nontherapeutic or inappropriate action that results in or might reasonably be expected to result in a patient's

unnecessary fear or emotional or mental distress; or

(4) failure or omission to provide any goods or services that are reasonably necessary to ensure safety and well-being and to avoid physical or mental harm;

(f) commission of any act of sexual abuse, sexual misconduct, or sexual exploitation related to the licensee's practice;

(g) verbal abuse, which shall be defined as any word or phrase spoken inappropriately to or in the presence of a patient that results in or might reasonably be expected to result in the patient's unnecessary fear, emotional distress, or mental distress;

(h) delegating any activity that requires the unique skill and substantial specialized knowledge derived from the biological, physical, and behavioral sciences and judgment of the nurse to an unlicensed individual in violation of the Kansas nurse practice act or to the detriment of patient safety;

(i) assigning the practice of nursing to a licensed individual in violation of the Kansas nurse practice act or to the detriment of patient safety;

(j) violating the confidentiality of information or knowledge concerning any patient;

(k) willfully or negligently failing to take appropriate action to safeguard a patient or the public from incompetent practice performed by a registered professional nurse or a licensed practical nurse. "Appropriate action" may include reporting to the board of nursing;

(l) leaving an assignment that has been accepted, without notifying the appropriate authority and allowing reasonable time for replacement;

(m) engaging in conduct related to licensed nursing practice that is likely to deceive, defraud, or harm the public;

(n) diverting drugs, supplies, or property of any patient or agency;

(o) exploitation, which shall be defined as misappropriating a patient's property or taking unfair advantage of a patient's physical or financial resources for the licensee's or another individual's personal or financial advantage by the use of undue influence, coercion, harrassment, duress, deception, false pretense, or false representation;

A-19

**(p)** solicitation of professional patronage through the use of fraudulent or false advertisements, or profiting by the acts of those representing themselves to be agents of the licensee;

**(q)** advertising nursing superiority or advertising the performance of nursing services in a superior manner;

**(r)** failing to comply with any disciplinary order of the board;

**(s)** failing to complete the requirements of the impaired provider program of the board;

**(t)** failing to furnish the board, its investigators, or its representatives with any information legally requested by the board;

**(u)** engaging in nursing practice while using a false or assumed name or while impersonating another person licensed by the board;

**(v)** practicing without a license or while the license has lapsed;

**(w)** allowing another person to use the licensee's license to practice nursing; or

**(x)** knowingly aiding or abetting another in any act that is a violation of any healthcare licensing act.

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitations of Fed. R. App. P.

32(A)(7)(B).  Exclusive of the exempted portions in Fed. R. App. P.

32(A)(7)(B)(iii) and D.C. Cir. R. 32(e)(1), the Brief contains 13,939 words.

This Brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this

Brief has been prepared in a proportionally spaced typeface using Microsoft Word

2007 in Times New Roman, font size 14.

Dated: December 22, 2015

/s/ Noel J. Francisco

 Noel J. Francisco
njfrancisco@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-5485

-and-

F. Curt Kirschner, Jr.
ckirschner@jonesday.com
Jonathan S. Sack
jsack@jonesday.com
JONES DAY
555 California St., 26th Floor
San Francisco, CA 94104
Telephone:  (415) 626-3939

*Counsel for Petitioner*
*Menorah Medical Center*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2015, I filed the foregoing using the ECF system, which is expected to electronically serve the Respondent's and Intervenor's respective counsel.

Dated: December 22, 2015

/s/ Noel J. Francisco

Noel J. Francisco
njfrancisco@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-5485

*Counsel for Petitioner*
*Menorah Medical Center*